UNITED STATES of America,
Plaintiff-Appellee,

v.

Robert Neal ALLEN,
Defendant-Appellant.

No. 85–1717.

United States Court of Appeals,
Seventh Circuit.

Argued Dec. 12, 1985.

Decided Aug. 14, 1986.

Rehearing Denied Oct. 1, 1986.

Irl B. Baris, St. Louis, Mo., for defendant-appellant.

Bruce Reppert, U.S. Attorney's Office, East St. Louis, Ill., for plaintiff-appellee.

Before COFFEY, FLAUM, and RIPPLE, Circuit Judges.

FLAUM, Circuit Judge.

This court is called upon to address the scope and administration of the Jencks Act, 18 U.S.C. § 3500, which requires a federal prosecutor to produce for the defense any statement or report made by a witness which relates to that witness's testimony on direct examination and, if contested, to submit the statement or report to the court for an *in camera* inspection. In this case the district court did not require the United States Attorney to produce the alleged Jencks material, nor did the court choose to examine the material *in camera,* purportedly because of an insufficient showing of relevancy and the prosecutor's assurance that all relevant material had been turned over. We review and outline the threshold requirements for making a Jencks Act request, vacate the decision below, and remand for an *in camera* hearing to determine the relevancy and materiality of the documents. We affirm on all of the defendant's remaining claims.

I.

Robert Allen was a welder for the Pipe Fitters Union for thirty years. In 1947, thirty-six years before he was arrested for selling a car-bomb to an undercover informant for the FBI, Allen had pled guilty to a charge of bank robbery. In 1982, during the course of his work as a welder, Allen met Jesse Stoneking, who claimed to be the right-hand-man of the leader of organized crime activity in southern Illinois. Stoneking had been imprisoned but was released after agreeing to become an undercover informant for the FBI. Stoneking's mission was a general one: he was to obtain information about criminal matters around St. Louis and southern Illinois. He was paid $2,700 a month for taperecording conversations he had with his former associates and, in the case of Allen, people he met during his almost twenty months of undercover work.

The investigation of Allen began when Stoneking observed Allen building a device to defeat a burglar alarm. As Allen was to do often later, he bragged about his expertise and told Stoneking that he knew how to build bombs. With the approval of the FBI, Stoneking told Allen that he would like Allen to build him a bomb. At first, Stoneking wanted a bomb to wreck a building, but later he decided that he would rather have a car-bomb with a remote-control detonating device. Allen told Stoneking that he could build a bomb that could be detonated from eighteen miles away and that he had built such a bomb for $7,000. Allen told Stoneking that his nickname was "little bomber" and that he had recently made a car-bomb for someone in Toledo. Allen agreed to build a car-bomb for Stoneking for the bargain price of $6,000 and on August 13, 1983, Stoneking and Allen drove from Illinois to Kentucky and purchased dynamite. Three days later Allen delivered to Stoneking a sophisticated car-bomb constructed of ten sticks of dynamite and a remote control detonating device.

Stoneking gave Allen $6,000 in cash for the bomb, but according to Allen, and unbeknownst to the FBI, arranged to receive much of the money back as a kickback. This was part of what Allen alleges was a scheme of coercion by Stoneking. While Allen did not deny the substantive crimes he was accused of, his defense was based on his knowledge of the reputation and connections of Stoneking, including a murder Stoneking allegedly had committed. Allen stated that he had no choice but to build the bomb after Stoneking threatened him and his sister.

Allen was tried and convicted on four counts of a five count indictment. The first count of conspiracy to transport explo-

sives in interstate commerce was dismissed, but Allen was convicted of the following: Count II: Interstate transportation of explosive material, in violation of 18 U.S.C. §§ 842(a)(3)(A) and 844(a); Count III: Possession of explosives by a convicted felon, in violation of 18 U.S.C. §§ 842(i) and 844(a); Count IV: Unlawful manufacture of a destructive device, in violation of 26 U.S.C. §§ 5802, 5822, 5845(a) and (f), 5861(f) and 5871; and Count V: Unlawful sale of explosives, in violation of 18 U.S.C. §§ 842(a)(1) and 844(a). The district court sentenced Allen to a term of ten years on Count IV and five years on Count V; the sentence on Count V to run consecutive to the sentence imposed on Count IV. The court suspended the sentence on Counts II and III and placed Allen on probation for five years for each count, to run concurrently with each other but consecutive to the sentences imposed on Counts IV and V.

Allen appeals six issues that arose during his trial. First, he contests the district court's imposition of separate sentences on each of the four counts he was convicted of even though all four counts arose out of the same set of facts. Second, Allen claims that he was charged with the criminal offense of transporting explosives by a convicted felon solely for the purpose of getting his thirty-six year old conviction before the jury and that the district court abused its discretion in not severing that portion of his trial. Third, Allen alleges that the district court erred in failing to make an independent determination of the accuracy of the government-prepared transcripts of the conversations between Allen and Stoneking that Stoneking secretly taped. Fourth, Allen alleges the district court erred in the method it used to tell the jury that there was insufficient evidence to submit Count I, thus implying that there was enough evidence to convict on the other four counts. Fifth, Allen argues that the district court erred in refusing to instruct the jury on the issue of coercion. Finally, Allen's sixth claim is that the district court erred in failing to require the government to deliver Jencks material to him or to the court for an *in camera* inspection.

Because we remand only on Allen's sixth claim, the violation of the Jencks Act, we begin there.

## II.

The government alleges that what Allen is seeking is the "production of all or substantially all of the government's case report under the Jencks Act (18 U.S.C. § 3500) pertaining to unrelated cases developed through the use of Mr. Stoneking." Appellee's Brief, p. 21. The alleged motivation for seeking this information is that Allen's counsel was representing a defendant in another related case and that the information Allen's counsel was seeking could be used to the advantage of that other client. Three weeks before Allen's trial the United States Attorney informed the district court by letter that this other client was accused of participating in the murder of a St. Louis crime boss whose car was destroyed by a remote control car-bomb several years before Stoneking met Allen. The government alleges that Allen took "credit" for producing that bomb in a taped conversation with Stoneking. Thus, both of Allen's counsel's clients were implicated in the same car bombing. Allen was admonished by the district court that his counsel might have a conflict, but he consented to his counsel's continued representation. The issue was not appealed.

During Allen's trial an F.B.I. Agent testified on direct examination about his conversations with Stoneking prior to Stoneking's release from prison and his stint as an undercover agent. Allen's counsel cross-examined the F.B.I. Agent and asked him about these conversations:

Q. Now it's customary, is it not, in your agency in the Federal Bureau of Investigation to make reports of your activities, isn't it?

A. Yes it is.

Q. And did you make out any reports concerning the negotiations that you had with Mr. Stoneking leading up to his release from the penitentiary?

A. No I didn't.

Q. Did any other agent do that?

A. No.

Q. That is unusual, isn't it, not to make reports?

A. Not concerning talking to cooperative witness. I made a report of whatever he told me concerning any criminal information that he gave me.

Q. You mean before or after his release?

A. Some were before.

Q. So you did make some reports then of the discussions that you had with him before he was released from the penitentiary?

A. Yes I did.

Q. And those are the same conversations that you testified to earlier that you had with him while he was in the penitentiary?

A. Yes.

When Stoneking was put on the stand, Allen's counsel in cross-examination sought to bring out details concerning Stoneking's negotiations with the F.B.I., arguably to support his "coercion" theory of defense.

Q. Okay. Then after you got out, you had some numerous conversations with the F.B.I., is that right?

A. Yes I did.

Q. And you gave them information as to what you knew about the activities in this area, right?

A. Yes, sir.

Q. And during that time, were they making notes when you would talk with them?

A. Yes, sir.

Q. And these are the conversations that you mentioned this morning when you testified about the various interviews that you had with F.B.I. agents, correct?

A. Yes, sir.

MR. BARRIS: Your Honor at this time I would request that the notes and reports concerning these interviews be furnished pursuant to Sec. 3500.

THE COURT: Yes and I ask the government to give the attorney for the defendant all of the Jencks Act material that is available, if you haven't already done so.

MR. PROUD: Every scrap of paper that concerns [Allen] has been given to Mr. Barris, Your Honor.

\* \* \* \* \* \*

MR. PROUD: I understand it very well, Your Honor. He has everything that pertains to [Allen]. The government sees this perhaps as some kind of discovery device for other cases.

THE COURT: And you know at this juncture, Mr. Barris, I think I would have to accept the government's representation to the Court in this regard.

The above exchanges present several questions regarding construction and administration of the Jencks Act. The Jencks Act was the congressional response to *Jencks v. United States*, 353 U.S. 657, 77 S.Ct. 1007, 1 L.Ed.2d 1103 (1957), which held that statements made by witnesses to an investigative agency, such as the F.B.I., must be produced, on motion of the defendant, if those statements relate to the subject matter as to which the witness has testified. The Act "reaffirms" rather than limits the *Jencks* decision. *Goldberg v. United States*, 425 U.S. 94, 104, 96 S.Ct. 1338, 1344, 47 L.Ed.2d 603 (1976) (quoting from S.Rep. No. 981, 85th Cong., 1st Sess., 3 (1957), U.S.Code Cong. & Admin. News 1957, pp. 1861, 1862). But the Act does demonstrate Congress's concern that defendants not be allowed to "rove at will through Government files," S.Rep. No. 569, 85th Cong., 1st Sess., 3 (1957), particularly when "confidential information containing matters of public interest, safety, welfare, and national security" are involved. H.R. Rep. No. 700, 85th Cong., 1st Sess., 4 (1957).

In skeletal form the Jencks Act provides that in a criminal prosecution brought by the United States, after a witness called by the federal prosecutor has testified on direct examination, the district court, on motion of the defendant, shall order the United States to produce any "statement or report" as defined by the Act in the posses-

sion of the United States that relates to the subject matter as to which the witness has testified. *Goldberg v. United States*, 425 U.S. at 97, 96 S.Ct. at 1341. If the entire contents of the statement or report relate to the testimony of the witness, then it is delivered directly to the defendant. If the government claims that any part of the statement or report contains matter that does not relate to the testimony, then the government must deliver it to the district court for an *in camera* inspection. The district court then must excise the portions of the statement or report that do not relate to the testimony of the witness, and if the defendant objects, the district court must order the United States to preserve the entire text of the statement or report for appeal. If the United States elects not to comply with an order of the district court to deliver to the defendant the statement or report, the district court strikes from the record the testimony of that witness and may declare a mistrial.

■ Thus, the questions that the district court must consider in every Jencks Act request for documents are: (1) is the document requested a "statement or report" as defined by the Act; (2) are the contents of the document relevant "to the subject matter as to which the witness has testified"; and (3) has the defendant requested the document with sufficient specificity and particularity so that (a) the government is given adequate notice as to which documents to produce and (b) the district court can make a determination whether to review the document *in camera*. Because the district court in this case declined to hold an *in camera* inspection, we must review briefly the discretion that a district court has on each issue when deciding whether or not to hold an *in camera* review of the disputed material, and the stan-

dard of appellate review of the court's determination that it need not hold an *in camera* review of the disputed document.

■ We need not reach the second issue of relevancy in this case because the district court did not reach the question of relevancy.[1] Although the record is unclear, it appears that the district court did not examine these documents *in camera* for three reasons: first, because the district judge relied on the government's assertion that everything that was a Jencks Act statement and "pertained" to the defendant had already been turned over to the defense; second, because of his assumption that the amount of information he would have to review to determine if the disputed documents were "statements" could be so great as to be impractical; and third, because Allen's defense counsel represented another defendant in a related criminal prosecution, his motives for seeking production were in question.

On appeal the government argues first that the documents requested were not statements as defined by the Jencks Act; second, that the district court properly relied on the government's assertions; and third, that the disputed documents were requested with insufficient specificity. We will discuss these questions of definition, reliance, and specificity in that order.

### A. Definition of a Jencks Act Statement.

■ The Jencks Act provides a three-part definition of the term "statement":
(1) a written statement made by said witness and signed or otherwise adopted or approved by him;
(2) a stenographic, mechanical, electrical, or other recording, or a transcription thereof, which is a substantially verbatim recital of an oral statement made by said

---

**1.** If the information defense counsel seeks to have produced exists, is requested with sufficient specificity, and is a statement as defined by the Jencks statute, then a determination of its relevancy must be made before it may be produced. There is no question that the statute *mandates* that if the federal prosecutor claims that the statements do not "relate to the subject matter of the testimony of the witness, the court shall order the United States to deliver such statement for the inspection of the court in camera." 18 U.S.C. § 3500(c); *United States v. Wables*, 731 F.2d 440 at 445 (7th Cir.1984); *United States v. Robinson*, 585 F.2d 274 at 281 (7th Cir.1978).

witness and recorded contemporaneously with the making of such oral statement; or

(3) a statement, however taken or recorded, or a transcription thereof, if any, made by said witness to a grand jury.

This definition clearly was intended by Congress to describe material that could reliably and fairly be used to impeach the testimony of a witness. *Goldberg v. United States,* 425 U.S. at 112, 96 S.Ct. at 1349 (Stevens, J., concurring). Whether a document is an original statement made by the witness, as described in the first sentence of the statutory definition, or a "substantially verbatim" copy as described in the second sentence of the definition, the emphasis clearly is on whether the statement can fairly be deemed to reflect fully and without distortion the witness's own words. *Id.; see also Palermo v. United States,* 360 U.S. 343, 352–53, 79 S.Ct. 1217, 1224–25, 3 L.Ed.2d 1287 (1959). A government agent's summary of a witness's oral statement that is not signed or adopted by the witness is not producible. *Palermo,* 360 U.S. at 353, 79 S.Ct. at 1225. Adoption or approval can be shown by demonstrating that the interviewer read back to the witness what he wrote and that the witness affirmatively stated his approval.

■ But an approval or signature alone are not enough to make a Jencks Act statement. The document, or part of a document, that the defendant seeks to have produced must be the type of factual narrative by the witness that is usable for impeachment. A federal agent's written impression of what a witness said, his strategy, or his conclusions from what the witness said are obviously not statements of the witness—unless the government agent who is the interviewer is himself a witness and testifies about the subject matter of that report.

■ Even if the witness is not the writer of the statement, however, and even if that document contains information that does not go to impeachment or was not approved by the witness, the Act provides that the district court excise those portions and turn over to the defendant the portions that fit the statutory definition of a "statement or report." Therefore, it is axiomatic that the district court make a determination of whether or not a contested document is a statement under the Jencks Act. "The district court is vested with broad discretion in determining this question through an *in camera* inspection. Its findings in this respect may be disturbed on appeal only if they are clearly erroneous." *United States v. O'Brien,* 444 F.2d 1082, 1087 (7th Cir.1971). Without question, there are some disputed documents that could be determined to not be Jencks Act statements without an *in camera* hearing.

But the determination of whether or not something is a Jencks Act statement often requires a judgment on its reliability—which is a judgment on its *content.* Therefore, if the defendant claims that the documents he seeks are statements as defined by the Jencks Act, but the government says they are not, then the *presumption* should be that the district court should hold an *in camera* hearing and after reviewing the documents make a determination of what should be turned over to the defendant. In such a case, then, the district court must review the documents in question when their status as a Jencks statement is contested. That determination need not be a heavy burden, since the review need not be a full evidentiary hearing, but merely an *in camera* review of the disputed document. *United States v. North American Reporting, Inc.,* 761 F.2d 735, 738–39 (D.C. Cir.1985). In the wide discretion afforded the district court, little extrinsic evidence ordinarily will be needed to determine if the statement is a Jencks Act statement. As the Supreme Court stated: "It is also the function of the trial judge to decide, in light of the circumstances of each case, what, if any, evidence extrinsic to the statement itself may or must be offered to prove the nature of the statement. In most cases, the answer will be plain from the statement itself." *Palermo,* 360 U.S. at 354–55, 79 S.Ct. at 1225–26. This discretion is further reason for a presumption

that if a document's status as a Jencks Act statement is disputed, the judge should examine the statement *in camera*. While it is difficult to imagine a case where extrinsic evidence would not be helpful, it is certainly not necessary if the statement itself is examined.

■ In order to trigger the presumption in favor of an *in camera* inspection, defendant need only have a reasonable argument that if the document says what he believes it says, based on the testimony of the witness on direct examination, then it can possibly be used to impeach that witness. Since defense counsel has not had the opportunity to see the disputed document, he need only lay a minimal foundation for its possible use as a Jencks statement. We recognized as much in the case of *United States v. Wables*, 731 F.2d 440, 445 (7th Cir.1984), where we held that unlike the situation in which the prosecutor claims the statement is not relevant (as discussed in the next section), an *in camera* inspection is not absolutely mandated by the statute, but inspection of the document ordinarily will be required.

If the prosecutor claims that a statement, as defined in subsection (e), contains matter that does not relate to the subject matter of the witness's testimony, the trial court must order the prosecutor to produce the statement for the inspection of the court. 18 U.S.C. § 3500(c) (1982). No such *in camera* inspection is mandated by the language of the Jencks Act if the prosecutor claims that a document is not a "statement" within the meaning of subsection (e). *However, in such situations, the United States Supreme Court has ruled that it is the trial court's responsibility to inspect the document and, after conducting an inquiry outside the presence of the jury, to determine the nature of the document.* [Cites omitted.] Applying this principle, this circuit has held that whether a document is a "statement" under the Jencks Act is a

question for the trial court, not for the government.

731 F.2d 445 [emphasis added].

■ In summary, we merely amplify this court's holding in *Wables*. While an *in camera* inspection is not statutorily mandated for a determination of whether a disputed document is a Jencks Act statement, the presumption is that an *in camera* hearing is needed to inspect the document. That presumption can be overcome by an articulation on the record as to why an examination of the document was unnecessary or pragmatically impossible.

*B. Reliance on Prosecution Assertions.*

In *Wables* and in *United States v. Keig*, 320 F.2d 634, 637 (7th Cir.1963), this court held that the district court could not rely on the government's assertion that the disputed document was not a statement and not related to the subject matter of the witness's testimony. *Keig* held that if the question of whether documents should be produced as a Jencks Act statement was adequately raised, then the district court must examine them. The prosecutor in *Keig* assured the trial court that the reports sought by defense counsel were beyond the scope of direct examination and the district court accepted that assertion. This court responded:

once the question has been raised by defense counsel, the court should dispose of it on its own responsibility based upon what it ascertains in a hearing. The court should not make a final disposition upon the representation of government counsel. It cannot escape its duty to learn the truth firsthand.

*Id.* at 637. To repeat, this was recently reaffirmed in *Wables*, 731 F.2d at 445 ("this circuit has held that whether a document is a statement under the Jencks Act is a question for the trial court, not for the government").

■ This does not conflict with our holdings in the *Brady* area, which allow the district court to rely on prosecutorial assertions that exculpatory material does

not exist. That Jencks Act cases are ·different than *Brady* cases is illustrated by *United States v. Navarro*, 737 F.2d 625 (7th Cir.1984), *cert. denied,* ── U.S. ──, 105 S.Ct. 438, 83 L.Ed.2d 364 (1984). In *Navarro* we held that because the defendants "offered ·nothing to rebut the government's explicit representation to the district court" that there was no exculpatory material in the defendants' INS file, it was not necessary to find an abuse of discretion in the district court's refusal to examine the file *in camera.* 737 F.2d at 632. We noted in that case that the *"Brady* analysis assumes the discovery, after trial, of favorable, material information known to the prosecution but unknown to the defense." *Id.* at 631. Therefore the mere existence of the INS file, and the defendant's speculation of what might be in it, is not enough to require the district court to examine the contents of the file. By contrast, Jencks Act statements are *required* by statute to be reviewed *in camera* if they are "statements" and are related to the testimony of a government witness. While the district court may be able, as in *Navarro*, to rely on a government assertion that a requested document does not exist, the court cannot rely on a government assertion that a document does not "relate to" the subject matter of the witness's testimony and should not rely on an assertion that the document does not fit the statutory definition of "statement." To do so would defeat the underlying intent of the Jencks Act. If there is any reasonable conflicting evidence, then an *in camera* inquiry must take place. The trial court, of course, has wide discretion to limit the length or scope of that inquiry so as to limit the temporal burden on the court.

### C. Threshold of Specificity and Particularity.

Before a district court can reach the question of whether a disputed document is a statement as defined by the Jencks Act, it must be requested with sufficient specificity. We have held that "the Act requires that a defendant first meet the burden of specifying with reasonable particularity (normally by his cross-examination at trial) that a certain document exists, that there is a reason to believe that the document is a statutory 'statement,' and that the Government failed to provide it in violation of the Act." *United States v. Robinson,* 585 F.2d 274, 281 (7th Cir.1978) (*en banc* ); *Goldberg v. United States,* 425 U.S. 94, 116, 96 S.Ct. 1338, 1350, 47 L.Ed.2d 603 (1976) (Powell, J., concurring). In *Robinson* this circuit found that the defendant "failed to carry his initial burden of defining with particularity a specific document which the Government failed to produce and therefore the court did not need to conduct an *in camera* inspection." 585 F.2d at 281. Because there was no evidence that the document the defense wanted even *existed* among the 10,000 documents in the case file, the court did not reach the issue of whether the "burden of specifying with reasonable particularity ... that there is reason to believe that the document is a statutory 'statement' " as defined by the Jencks Act, was met in that case.

■ It is difficult to establish a particular bright line level of specificity that must be met by defense counsel to demonstrate that the information he seeks is a Jencks Act statement. It is clear that the more obvious it is that the statement is a Jencks Act statement, the less specific the foundation laid must be to meet the defense counsel's burden of particularity. Therefore each case must be analyzed in light of its own particular set of facts. In *Goldberg v. United States,* 425 U.S. 94, 100–101, 96 S.Ct. 1338, 1343–44, 47 L.Ed.2d 603 (1976), for example, the Supreme Court found that the defense counsel in that case had laid an adequately specific foundation by asking the witness during cross-examination whether the prosecutor who was taking notes of the witness's answers to his questions read back the answers for the witness to approve. Moreover, if the government agent, whether he be prosecutor or investigator, is himself put on the stand as a witness, then *his* report clearly falls within the definition of a signed statement. *Unit-*

*ed States v. Cleveland,* 477 F.2d 310, 315–16 (7th Cir.1973). Investigators' reports, such as FBI agents' reports, so clearly fall within the language of the Jencks Act, and have so widely been held to be producible, that defense counsel need not establish definitely that the report is signed by the witness to demonstrate that it qualifies as a Jencks statement. *Goldberg v. United States,* 425 U.S. at 112–13, 96 S.Ct. at 1349–50 (Stevens, J., concurring), outlines the nature and scope of reports that are allowable as Jencks Act statements. Justice Stevens notes that one important factor in determining whether a writing is a Jencks Act statement is why the document was made to begin with. 425 U.S. at 113 n. 3, 96 S.Ct. at 1349 n. 3. Reports by investigative agents, such as the FBI, or the prosecution itself, are made so that the prosecution may "confront a recalcitrant, forgetful, or perjurious witness with a prior statement in order to induce him to tell the whole truth and nothing but the truth." *Id.* Therefore, these types of reports are usually reliable and more often than not specifically detail the actual words of both the witness and the interviewer. *Id.* As the House Report which accompanied the Jencks Act stated:

> It has always been, and will remain, the practice of the FBI and every other Federal law enforcement agency to take written statements of important witnesses. This is vital not only to insure the accuracy of the statement at the time it is made but to tie the witness down so that he will stand by the statement which he has read and signed.

H.R.Rep. No. 700, *supra* at 7. Thus, the Jencks Act clearly anticipated that FBI reports, more often than not, would be statements as defined by the Act because of their consistent reliability.

■■■■ Because the determination of adequate specificity is a fact-bound inquiry, an appellate court must be duly deferential to the trial court's findings and should overturn a district court's *overt* factual finding of a lack of specificity only when it is clearly erroneous. The district court's

holding, however, must also be made with reasonable specificity, including why the defendant's counsel was not given an opportunity to attempt to make his request more specific, for example, by continued cross-examination after prosecution protests of a lack of specificity. A defendant and his counsel should not be caught in the trap of being denied a request for something they have never seen, and which the government does not want them to see, because they have not asked specifically enough for it.

On the other hand, attempts to get information can also be merely attempts to harass or stall. They can become "fishing expeditions" into prosecution files, which the government argues this case would have become. This is one area where the questions of specificity and definition overlap. The trial judge is a referee over this information exchange and thus must make difficult decisions concerning motive and strategy before he or she even arrives at the question of content. As an appellate court we should make no attempt to second-guess these often delicate holdings of the district judge made in the flux and fury of an on-going trial. But because of the clear language and intent of the Jencks Act, the presumption on appeal is that an *in camera* inquiry is generally required, and thus the district court must specifically delineate why it is not holding such an examination.

■■■■ Accepting the premise that the defendant does not necessarily know what is contained in the prosecution file but has a constitutional *(Brady)* and statutory (Jencks) right to any information that could possibly be used to impeach a prosecution witness, then it is appropriate to conclude that the defendant need not be extremely particular in requesting such information. A defendant's counsel cannot be overly specific about items he may never have seen. This is reflected in the often quoted language of Chief Justice Marshall in *United States v. Burr,* 25 Fed.Cas. No. 14,694 p. 187, 191 (1807), who stressed that if the "paper be in possession of the opposite

party," the requesting party cannot be specific about its "contents or applicability" or its "particular passages." 25 Fed.Cas. at 191. The same is true of particular passages in several reports rather than one letter. In *Robinson* the district court was faced with the prospect of reviewing up to *ten thousand* pages. That was clearly an unwarranted "fishing expedition." However, the district court should at a minimum review the prosecution index which should be developed in a case with scores of documents. The district court must be allowed wide discretion in determining what number of documents it can reasonably review. There is obviously no magic number. But the trial court should inquire how many documents there are which a witness has testified to, and if there is a significant number, if the prosecution has an indexed summary of those documents. In other words, *both* the prosecution and the defense have an obligation to assist the trial court in determining whether disputed documents should be produced under the Jencks Act. Particularly because the trial court may rely on the prosecution's assertion (if there is no conflicting evidence) that a document does not exist, the prosecution's obligation should include informing the district court, with reasonable certainty, how many documents that the witness testified to exist in its files.[2]

### III.

 In this case the defendant's request for the FBI agent's reports, filed after his conversations with Stoneking, meet the minimal level of specificity justifying a review by the district judge to determine if they met the statutory definition of "statement" and to determine their relevancy. Both the FBI agent and Stoneking testified that reports were filed concerning their conversations. We need not find that those reports clearly were statements, but only that because of precedent the district court had a responsibility to examine them. In addition, because it is not denied that they exist and because as FBI reports they may be "statements," the only remaining question is one of relevancy. If relevancy is the only issue, then an *in camera* review is required by statute. In other words, because F.B.I. reports are consistently, but not *per se*, reliable, we find that Allen's counsel laid a sufficient foundation to raise a presumption that the disputed documents should be examined *in camera.*

This case is especially intriguing because it presents a collateral conundrum to the classic Jencks statement situation. These reports were testified to both by the FBI agent and Stoneking and thus *could* be used to impeach either one of them. Therefore, even if this report did not meet the "substantially verbatim recital of an oral statement made by said witness" test in the second sentence of the Jencks Act definition of "statement," because it details a conversation that was converted to a report by a federal agent who was also a witness, it might meet the "written statement ... signed or otherwise adopted or approved by him" test in the first sentence of the definition.

 It was inappropriate for the district court to rely on the prosecution assertions concerning the content of those doc-

---

2. Chief Justice Marshall also touched on the issue of whether the document requested had to deal specifically with the defendant before it could be produced. 25 Fed.Cas. at 191. Clearly, there is no requirement that the defendant must be named in the contested statement for it either to be a Jencks Act statement or a relevant statement. No case has so held and to do so would fly in the face of logic and the intent of the Act. As Chief Justice Marshall said in *United States v. Burr:*

Let it be supposed that the letter may not contain anything respecting the person now before the court. Still it may respect a witness material in the case, and become important by bearing on his testimony. Different representations may have been made by that witness, or his conduct may have been such as to affect his testimony. In various modes a paper may bear upon the case, although before the case be opened its particular application cannot be perceived by the judge.
25 Fed.Cas. at page 191.

uments.[3] If some of the information contained in those reports should not be turned over to the defendant's counsel because of his role as defense counsel in another case, then the district court can direct the excising of those portions of the reports.

The district court in this case may rely on the prosecution's assertion of how many documents the two witnesses testified to, but the evidence in the record appears to show that these are considerably less than the enormous numbers involved in *Robinson*. 585 F.2d at 274. Here the district court did not inquire into how many disputed documents there were, or proceed to make a determination that the temporal exigencies of an outgoing trial prohibited review of all of the disputed documents. It is not obvious that the inquiry in this case would be an impossible, or even unnecessary, burden on the district court. Therefore, we must vacate the judgment of conviction and remand for the sole purpose of holding an *in camera* review of the disputed documents to see if they should be produced. This is a limited holding. The remedy we fashion follows *United States v. O'Brien*, 444 F.2d 1082, 1087 (7th Cir. 1971); *United States v. Keig*, 320 F.2d 634, 637 (7th Cir.1963); *see also Killian v. United States*, 368 U.S. 231, 244, 82 S.Ct. 302, 309, 7 L.Ed.2d 256 (1961); and *Campbell v. United States*, 365 U.S. 85, 81 S.Ct.

421, 5 L.Ed.2d 428 (1961). As we stated in *O'Brien*,

If, on remand, the district court determines that such materials contain no information warranting their production to the defendant, it should enter a fresh final judgment based upon the record as supplemented by such findings, thus preserving to defendant-appellant the right of appeal therefrom. Conversely, if the district court concludes that the production of related portions of such materials for defendant's examination was wrongfully denied, it would then become its duty to accord defendant-appellant ... a new trial.

444 F.2d at 1087.

Contrary to the assertions of the dissent, the parameters of this limited holding are clear. It is not an appellate court's role to determine that a document we have not seen is or is not a "statement," or is or is not relevant to the testimony adduced at trial. We hold only that the defendant "raised a sufficient question under the Act to require the trial judge to conduct such an inquiry." *Goldberg*, 425 U.S. at 100, 96 S.Ct. at 1343. The defendant in this case has met his minimal burden of showing that "there is good reason to believe [the FBI reports] may be 'statements'." *Id.* at 119, 96 S.Ct. at 1352 (Powell, J., concurring). F.B.I. reports are not *per se* Jencks Act statements, but our analysis of the Act's legislative history clearly shows they

---

**3.** The dissent states that the requirement that we allegedly "create" here is "nothing but unsupported conclusions without recitation of any basis in law or the facts of this case." The dissent's analysis of the record is by necessity an assessment of the prosecution's testimony concerning what the F.B.I. reports state. The defense cannot testify as to the content of the reports because defense counsel has not been allowed to see them. Therefore, when the dissent asserts that "we have not seen the specific F.B.I. reports but the testimony concerning them clearly delineates and explains their content; specifically that they do not deal with any of the facts concerning the case in controversy," (page 51, footnote 6), the dissent is merely accepting the government's assertions. We do not "contest" the government's assertions because they may well be correct, but the district court cannot rely solely on those assertions. In this

case Allen's defense was coercion and thus an integral facet of that defense was what was said during the conversations between government and government-informer. Allen argues that Stoneking coerced him into building a bomb because Stoneking needed to fulfill his obligation to the government agents to assist them in fighting crime in the St. Louis area. Allen alleges that rather than report on organized crime figures, Stoneking "manufactured" the crime at issue here in order to satisfy the government and earn his exorbitant salary. Therefore, those early conversations may well detail what was required of Stoneking by the government—no matter what the prosecution asserts. Allen's counsel may not have done all that he could have done to lay a foundation for his request but the record is clear that he did enough in this context.

were considered a prime example of the type of consistently reliable document Congress anticipated would be a "statement" under the Act. See *supra* at 996–997. Congress has thus directly spoken to the issue of these reports' general reliability. We do not, and cannot, decide whether the particular FBI reports involved here are reliable Jencks Act statements. However, when the defense is entrapment, the fact that there unquestionably exist F.B.I. reports of conversations between an F.B.I. Agent and the prisoner who eventually became the government informer when released, makes it more than a "speculative possibility" that those reports are Jencks Act statements. Thus a low level foundation is required for an *in camera* examination of the contested documents. Once that minimal burden is met, there is a presumption that an *in camera* hearing is needed.

This is a narrow holding that does not catapult the Jencks Act into a broad discovery device that will be used as a net in future fishing expeditions into government files. The procedures mandated by the Jencks Act do take time. But they do not burden the business of the overworked district courts because they *are* the business of the district courts. The Jencks Act merely spells out in detail the business district courts have always been in: the business of reviewing the relevance of the evidence that determines guilt or innocence.

Therefore, we reverse and remand in part.

### IV.

Allen's five other claims will be dealt with briefly in this section in light of our review of the record and applicable precedent.

#### A. Multiple Count Sentencing.

Allen was convicted and sentenced on four counts which, as the prosecution admits, all arose from the same set of facts. Allen contends that because he was subject to the same penalty for each count, all but one of those counts should be vacated.

 The double jeopardy clause of the Fifth Amendment protects against multiple punishments for the same offense. "Where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not." *Blockburger v. United States*, 284 U.S. 299, 304, 52 S.Ct. 180, 182, 76 L.Ed. 306 (1932). The *Blockburger* test has been applied consistently to questions of statutory construction on the assumption that Congress ordinarily does not intend to punish the same offense under two different statutes. *Ball v. United States*, 470 U.S. 856, 105 S.Ct. 1668, 1672, 84 L.Ed.2d 740 (1985); *North Carolina v. Pearce*, 395 U.S. 711, 717, 89 S.Ct. 2072, 2076, 23 L.Ed.2d 656 (1969). A single transaction *can* give rise to more than one conviction, under separate statutory provisions, without violating the Constitution. *United States v. Dennison*, 730 F.2d 1086 (7th Cir.), *cert. denied*, 469 U.S. 916, 105 S.Ct. 293, 83 L.Ed.2d 228 (1984).

 In the present case, Allen was convicted under four separate statutory provisions.[4] Each individual conviction consists of a separate violation of the laws of the United States and requires proof of facts unique to that specific conviction.[5] In this context, that in itself is enough to meet the *Blockburger* test. Therefore, Allen was properly sentenced by the district court.

---

4. *Count II*—18 U.S.C. §§ 842(a)(3)(A) and 844(a).
 *Count III*—18 U.S.C. §§ 842(i) and 844(a).
 *Count IV*—26 U.S.C. §§ 5802, 5822, 5845(a) and (f), 5861(f) and 5871.
 *Count V*—18 U.S.C. §§ 842(a)(1) and 844(a).

5. *Count II*—Proof of interstate transportation.

*Count III*—Proof that defendant is a convicted felon.
*Count IV*—Proof of unlawful manufacturing of explosives.
*Count V*—Proof of unlawful selling of explosives.

### B. Prior Felony Conviction.

 Allen was charged with the criminal offense of transporting explosives by a convicted felon, 18 U.S.C. §§ 842(i) and 844(a). At his trial, the prosecution introduced a certified copy of the defendant's prior conviction, by plea of guilty, of armed bank robbery on June 20, 1947. On appeal, Allen claims that the district court abused its discretion in admitting the prior conviction into his trial thirty-eight years later.

Under Rule 609(b) of the Federal Rules of Evidence, a thirty-eight year old conviction would not be admissible to impeach a criminal defendant. However, in this case the prior felony conviction was an element of the crime charged under 18 U.S.C. 842(i). Allen's defense counsel suggested that because all five counts arose from the same set of facts, the sole purpose for charging Allen with Count III was to prejudice the jury as to the other counts by introducing the old armed robbery conviction. Allen's defense counsel suggested two alternatives to avoid the prejudicial impact of the prior conviction: first, sever the trial of Count III from the other counts, or, second, stipulate and not inform the jury of the prior conviction.

The government agreed to stipulate that Allen had a prior felony conviction but insisted that the jury know of the stipulation so that there would be no confusion. The district court agreed, also concluding that because the same set of facts and circumstances would prove the separate offenses they should not be severed. The district court found that the defendant's proposed stipulation would be likely to confuse the jury.

In most, but not all, cases, "a party is not required to accept a judicial admission of his adversary, but may insist on proving the fact." *Parr v. United States*, 255 F.2d 86, 89 (5th Cir.), *cert. denied*, 358 U.S. 824, 79 S.Ct. 40, 3 L.Ed.2d 64 (1958); *see also United States v. Spletzer*, 535 F.2d 950 (5th Cir.1976). A fact may be proved "as long as the probative value of the proof still exceeds the prejudicial effect, *taking into account the offer to stipulate.*"

*United States v. Provenzano*, 620 F.2d 985, 1004 (3rd Cir.) (emphasis added), *cert. denied*, 449 U.S. 899, 101 S.Ct. 267, 66 L.Ed.2d 129 (1980). Indeed, "[a] cold stipulation can deprive a party 'of the legitimate moral force of his evidence,' 9 Wigmore on Evidence § 2591 at 589, and, can never fully substitute for tangible, physical evidence or the testimony of witnesses." *United States v. Grassi*, 602 F.2d 1192, 1197 (5th Cir.1979), *vacated on other grounds*, 448 U.S. 902, 100 S.Ct. 3041, 65 L.Ed.2d 1131 (1980).

This general rule is merely a reiteration of the balancing test prescribed by Rule 403 of the Federal Rules of Evidence, which provides that:

> Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of the unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

The sole issue then is whether or not the district court abused its discretion under Rule 403 when weighing the probative value against the unfair prejudice. Allen has an uphill battle to prove an abuse of discretion because "[i]t is important to keep in mind that the trial judge has wide discretion in rendering FRE 403 rulings, and will be reversed on appeal only if there has been a clear abuse of that discretion." *Noel Shows, Inc. v. United States*, 721 F.2d 327, 329 (11th Cir.1983); *Wright v. Hartford Accident & Indemnity Company*, 580 F.2d 809, 810 (5th Cir.1978).

We agree with the district court that the probative value of Allen's prior felony record is substantial because it is an element of the crime charged. Furthermore, it is difficult to see how the district court could have diminished the possible prejudice by any stipulation, including those suggested by both the defense and the prosecution. Any jury that was told that the parties had stipulated that the first element of the criminal offense of transporting explosives by a convicted felon had

been met, would infer that the defendant must be a convicted felon. Even if the jury is not told about the stipulation and counsels' argument before the jury just "assumes" that that element of the crime has been met, then the jury will "assume" as well that the defendant is a convicted felon. Most importantly, in this case, either of those options would arguably have prejudiced Allen more than proving his conviction before the jury because of the peculiar facts of that conviction. The jury undoubtedly discounted the relevance of the conviction to the other crimes charged because it was so old and was the product of a plea. However, if the jury were to infer or assume that the defendant was a convicted felon they may well simply infer or assume that the felony was committed recently rather than thirty-six years ago. Therefore, under these particular facts, it is unclear that any stipulation would have lessened the prejudicial impact of proving an element of the offense charged. No suitable stipulation was offered and it is clearly conceptually difficult, if not impossible, to construct a nonprejudicial one. *See United States v. Provenzano,* 620 F.2d 985 (3rd Cir.), *cert. denied,* 449 U.S. 899, 101 S.Ct. 267, 66 L.Ed.2d 129 (1980).

Under these unique circumstances the district court did not clearly abuse its discretion in allowing into evidence the defendant's prior conviction.

## C. *Government Transcripts of Recordings.*

 Allen argues that the district court erred in refusing to make an in-camera determination as to the accuracy of the government-prepared transcripts before they were given to the jury. It is within the sound discretion of the trial court to allow a transcript to be used by the jury to assist it in listening to a tape recording.

*United States v. McMillan,* 508 F.2d 101, 104 (8th Cir.), *cert. denied,* 421 U.S. 916, 95 S.Ct. 1577, 43 L.Ed.2d 782 (1974). Because a transcript is intended to be used *only as a guide,* "the jury should be instructed that a transcript is just another piece of evidence subject to objections, that it may have to be evaluated for accuracy, and that the jury need not accept any proffered transcript as accurate." *United States v. Onori,* 535 F.2d 938, 949 (5th Cir.1976).

In *Onori,* the Fifth Circuit confronted a similar defense argument and held:

Given that a transcript is merely another type of evidence, the fallacy in appellant's threshold contention—that the court had to make an in-camera determination of which portions of the proffered transcripts were "correct"—is obvious. These decisions are precisely the traditional functions of the jury. We conclude that it is unnecessary for the trial court to decide whether a transcript is accurate before that transcript is given to the jury, so long as each side to the dispute is given an opportunity to submit a transcript containing its version of a conversation.

*Id.* at 947–48.

In fact, this case demonstrates a concerted effort by the district court and the prosecution to use the tape recordings fairly. For example, the government tapes were made available to counsel for the defendant prior to the trial. The defense did not allege that any crucial, or even particularly important, portions of the tape were inaudible. The defense was given ample time to prepare its version of the conversations recorded on the tapes. Before viewing the transcripts, the jurors were clearly and carefully admonished by the district court that what they heard *on the tapes* was the evidence they should consider.[6] The tran-

6. The court admonished the jury as follows:
Now there are several things that you need to understand about it. In addition to the tape being played, the Court is going to allow the government to give you a transcript of the tape. Now the transcript has been typed up by the government and it is the government's

version of what is on the tape. Now the tape is, and what you hear on the tape is, and you need to understand, is the best evidence, and it is the evidence that you should consider in determining and finding the facts in this case.
There may be some discrepancies between the tape, as you hear it, and what is on the

scripts were collected immediately after each particular segment was played.

■ This circuit still clearly prefers the procedure followed in *United States v. Dorn*, 561 F.2d 1252, 1257 (7th Cir.1977), where the district court conducted a hearing, outside the presence of the jury, to determine the accuracy of the transcripts. However, this procedure is not mandatory when the tape recordings are almost completely audible. We do not reach the issue of what procedures are necessary when a substantial or merely important part of the recording is of questionable quality. *Cf. United States v. Robinson*, 707 F.2d 872 (6th Cir.1983); *United States v. Chiarizio*, 525 F.2d 289 (2d Cir.1975). We hold only that in this case the district court implemented sufficient safeguards to assure a fair trial and thus did not abuse its discretion.

### D. Implication of Insufficiency in the Dismissal of Count I.

■ Allen argues that the district court's remarks to the jury when the court announced the dismissal of Count I implied that the evidence was insufficient to convict the defendant. Count I charged Allen of conspiracy with Pat McAtee, a co-defendant who had been severed from the trial, to transport the explosives in interstate commerce. The district court granted Allen's motion for judgment of acquittal as to Count I and just prior to closing arguments stated to the jury:

> Members of the jury, the testimony has all been presented and the court has taken up several matters with the attorneys for the parties and the Court has determined that there is insufficient [evidence] to submit this matter to you ladies

and gentlemen with regard to count 1, the conspiracy charge between the defendant Allen and the defendant McAtee.

> The Court nevertheless will submit the case to you ladies and gentlemen on Counts 2, 3, 4 and 5 and we're ready now for closing arguments to be made by the attorneys for the parties.

Allen's motion for a mistrial, on the theory that the language the district court used implied to the jury that there was enough evidence to convict Allen on counts two through five, was denied. We affirm.

Allen makes no claim that the district court erroneously instructed the jury in the elements of the offense, reasonable doubt, or burden of proof. The district court followed the Seventh Circuit Pattern Instruction 1.03 and cautioned the jury that,

> Neither by these instructions nor by any ruling or remark which I have made, do I mean to indicate any opinion as to the facts. or as to what your verdict should be. You are the sole and exclusive judges of the facts.

In the context of a trial where most of the salient facts were not in dispute (because the defendant's defense was coercion and entrapment), the instructions *as a whole* did not imply that the evidence was sufficient to convict on the other counts.

### E. Denial of Coercion Instruction.

Allen's defense before, during, and after his trial was that he was coerced into violating the law as a result of the reputation and threats of the chief witness for the prosecution, Jesse Stoneking. However, the district court refused to give any coercion instruction and specifically rejected Allen's offered "Instruction Number 11,"

---

transcript and if you find such a discrepancy, why then the tape and what is said and what you hear on the tape is controlling, not the transcript. The transcripts will be handed to you then they will be taken away and they are only an aid in helping you understand the tape as it is played. And again I want to emphasize that the tape is the best and as a matter of fact the only evidence that the Court is allowing to be introduced.

Now there may be discrepancies again, and because of these discrepancies, there will be possibly argument or comment made by counsel later on with regard to these, and that is perfectly all right as to what either one of the parties on the tape may have said during the course of the conversations. And again, they are the government's version with regard to what the tapes say.

The admonishment was given by the Court *on every occasion* a transcript was used.

which is based on Seventh Circuit pattern instruction No. 4.05.[7]

 While generally the defense of coercion, compulsion or duress is an "issue of fact to go to the jury," *United States v. McKnight*, 427 F.2d 75, 77 (7th Cir.1970), *cert. denied*, 400 U.S. 880, 91 S.Ct. 124, 27 L.Ed.2d 118 (1971), in order to become entitled to a jury instruction on the defense, the defendant must present sufficient evidence with respect to each element of the defense. *United States v. Bailey*, 444 U.S. 394, 414–15, 100 S.Ct. 624, 636–37, 62 L.Ed.2d 575 (1980); *United States v. Mauchlin*, 670 F.2d 746, 748 (7th Cir.1982). Defining what is a sufficient amount of evidence to bring an issue to the jury has historically depended on both the specific facts of the crime and of the defense. But it is clear that the defendant need not prove his case: he need only meet a minimum standard of evidence. *United States v. Bailey*, 444 U.S. at 415, 100 S.Ct. at 637. The law of this circuit is that a "defendant is entitled to have the jury consider any theory of defense which is supported by

law and has some foundation in the evidence even though such evidence may be weak, insufficient or of doubtful credibility." *United States v. Brown*, 785 F.2d 587, 590 (7th Cir.1986) (quoting *United States v. Patrick*, 542 F.2d 381, 386 (7th Cir.1976)); *United States v. Lehman*, 468 F.2d 93, 108 (7th Cir.), *cert. denied*, 409 U.S. 967, 93 S.Ct. 273, 34 L.Ed.2d 232 (1972).

 The traditional tests for determining the sufficiency of the evidence requires the defendant to establish two elements: (1) immediacy of a threat of severe bodily injury or death which can be avoided only by committing a crime, *United States v. Mauchlin*, 670 F.2d at 748; *United States v. Stevison*, 471 F.2d 143 (7th Cir.1972), *cert. denied*, 411 U.S. 950, 93 S.Ct. 1933, 36 L.Ed.2d 411 (1973); and (2) the existence of no reasonable legal alternative to violating the law. *United States v. Brown*, 785 F.2d at 590; *United States v. Quilty*, 741 F.2d 1031, 1033 (7th Cir.1984); *United States v. Trapnell*, 638 F.2d 1016, 1030 (7th Cir. 1980).[8] Applying those two standards to

---

7. The instruction the defendant submitted reads:

> One of the issues in this case is whether the defendant was coerced. A defendant who has been coerced must be found not guilty.
>
> If the defendant committed the offense charged only because he reasonably feared that immediate, serious bodily harm or death would be inflicted upon him (or others) if he did not commit the offense, and he had no reasonable opportunity to avoid the injury, then he was coerced.

8. The Supreme Court's most recent discussion of the defense of duress, *United States v. Bailey*, 444 U.S. 394, 100 S.Ct. 624, 62 L.Ed.2d 575 (1980), does not change this test. *Bailey* is one of a series of prison escape cases where the prisoners' defense is that they were forced to flee the coercive conditions of the prison because their life was in danger. The Court found that the crime of escape from custody was a "continuing offense" and thus the factors considered when weighing the sufficiency of the evidence are slightly different than in non-escape cases. In *Bailey* the prosecution argued that the evidence was insufficient on two grounds. The first was that the threats and prison conditions that allegedly justified their escape were "not sufficiently immediate or serious" enough. 444 U.S. at 411, 100 S.Ct. at 635.

Second, and unique to the prison custody area, the prosecution argued that once the prisoners had escaped the coercive conditions of the prison, they had a duty to terminate their status as fugitives. The Supreme Court refused to reach the first issue (the immediacy and seriousness of the threat) because the second was determinative. The Court held,

> We need not decide whether such evidence as that submitted by respondents was sufficient to raise a jury question as to their initial departures ... several considerations lead us to conclude that, in order to be entitled to an instruction on duress or necessity as a defense to the crime charged, an escapee must first offer evidence justifying his continued absence from custody as well as his initial departure and that an indispensable element of such an offer is testimony of a bona fide effort to surrender or return to custody as soon as the claimed duress or necessity had lost its coercive force.

444 U.S. at 412–13, 100 S.Ct. at 635–36. Therefore it is clear that *Bailey* in no way changed the traditional test for weighing the sufficiency of the evidence when determining whether or not an issue should have gone to the jury in cases where escape from some form of custody, or for example from a duty to attend a sentencing (*see United States v. Brown*, 785 F.2d at 590), are not involved.

this case, we find that while Allen's evidence focused on the coercion issue, there was little evidence of an immediate threat or an inability to avoid violating the law. Allen testified that he was afraid of Stoneking's "connections" in the crime world and afraid of Stoneking's general reputation for "killing and violence." Allen claimed, though it is not clear from where in the taperecorded conversations, that Stoneking threatened Allen and his sister if Allen did not build the bomb. Allen was afraid to go to the police, again because of Stoneking's alleged "connections." Allen testified that the threats, if they existed, were vague and had no immediate time-frame. There was no evidence in the taperecorded conversations that Stoneking had such contacts with law enforcement officials that Stoneking would learn if Allen went to the police to complain. Allen did not allege that he knew Stoneking was involved with the government, nor did he allege that he had any knowledge of Stoneking's role as a government informant. Allen did allege that Stoneking disguised his voice to sound like Allen and had pretended to be Allen in a telephone conversation with Allen's sister. Thus, Allen presented very little evidence that he was actually faced with an immediate threat that left him no alternative but to violate the law. Moreover, because the testimony and evidence in support of Allen's sole theory of defense did go to the jury, and because of the wide discretion afforded the trial judge, we hold that a jury instruction was not mandated.

The prosecution argues that at trial they made clear that one exchange in particular between Stoneking and Allen demonstrated that no injury was imminent and thus there was no coercion:

> Q. Well did you make the statement during the first meeting on July 14, 1983, "If I tell you I'm going to do something, I'm going to do it. If I don't want to do it, if I feel leery about it ..." Stoneking: "Right." [Allen:] "I'll tell you." Stoneking: "That is your business, right." Did that exchange take place?

> A. I made that statement.
>
> Q. That if you didn't want to do it, if you felt leery about it, that you wouldn't do it, isn't that right?
>
> A. In answered your question. [sic]
>
> Q. And didn't Mr. Stoneking say, "That is fine. That is exactly the way we like it"?
>
> A. He said something similar to that.

With this testimony in mind, the record indicates that the district court weighed the slight evidence offered and declined to give the coercion instruction, making a comment that could be interpreted as a finding that Allen was a less credible witness than Stoneking.

This approach causes concern for three reasons. First, credibility determinations are jury considerations. Even if any comment by the district court could be interpreted as a credibility finding, it was not before the jury, and because there is *no* evidence that it was a determinative factor in the decision, it *alone* cannot be held to be error. If it was a finding that went to credibility and a determinative factor in the decision, we would be required to reverse.

Second, in order to receive an instruction on coercion the defendant need only meet a minimal showing, and that evidence should be taken as true. Thus, in most contexts, it is inappropriate to weigh the defendant's evidence against the prosecution's evidence to make the determination whether or not to give a coercion instruction. Therefore, the above quoted exchange between Stoneking and Allen that was brought out at trial should not have been a factor in deciding whether or not an instruction should be given. The district court's task is to examine the defendant's evidence alone, assume it could be believed by the jury, and then determine if it is sufficient enough to require an instruction. The record shows that the district court properly did not weigh the exchange that the prosecution asserts shows a lack of coercion against the defendant's evidence of coercion, but that the court based its

holding solely on the defendant's evidence. That evidence is so minimal that we affirm the district court's refusal to give a coercion instruction.

 Third, in our recent case of *United States v. Brown*, 785 F.2d at 589–90, one factor in the decision was that while the district court did not give a coercion instruction, all the testimony and evidence in support of the defendant's insanity and necessity defenses was presented to the jury. In this case the defendant attempted to corroborate his testimony with that of his sister but the district court refused to allow the testimony into evidence after Allen made an offer of proof as to the subject matter of that testimony. When the essential facts of a case are not in dispute and the defendant's sole theory of defense is coercion, the district court should use particular care in denying the defendant a jury instruction when not all the relevant evidence the defendant offered has been admitted. In this case, the offer of proof that set out what defendant's sister would testify to demonstrated that the testimony was only repetitive of what the jury had already heard. The defendant only alleged that his sister's testimony would corroborate his own and thus bolster his credibility—but credibility is irrelevant when determining whether or not to give an instruction. If there was any allegation that the evidence not admitted was not repetitive and was important to the theory of the defense, then its exclusion would be error. Because there is no harmless error possible on the refusal to give a necessary instruction, we would be forced to reverse. But in this case, Allen sought only to buttress the credibility of his allegations, not add to them, and thus the refusal to allow his sister to testify is an insufficient ground to reverse the court's refusal to give a coercion instruction.

However this remains a troublesome matter. While Allen's theory of defense was, to use the language of *Patrick*, "weak, insufficient or of doubtful credibility," 542 F.2d at 386, it is difficult to find that it does not have *"some* foundation in

the evidence." *Id.* (emphasis added). But it is clear that this circuit has interpreted "some," even in the *Patrick* case itself, to mean *more* than just the mere existence of a foundation in the evidence. *See generally, United States v. Brown*, 785 F.2d at 590; *United States v. Quilty*, 741 F.2d at 1033; *United States v. Trapnell*, 638 F.2d at 1030. While factual comparisons between cases are inherently subjective, this precedent, and the district court's wide discretion, lead us to hold that there was no reversible error in denying Allen's coercion instruction.

### V.

For the above reasons we affirm in part and reverse and remand in part.

COFFEY, Circuit Judge, concurring and dissenting.

I concur with the majority in its treatment of all the issues raised in this case, except for the Jencks Act issue. I dissent since the majority misinterprets the Jencks Act and case law interpreting the scope of the Act and, as a result, imposes an unnecessary burden on the district courts in this circuit to conduct unwarranted evidentiary hearings.

### I

The record reveals that FBI Agent Fox testified on direct examination that he had several conversations with Stoneking, a convicted felon, while Stoneking was confined in prison. The agent did not testify as to the details of those conversations; rather he merely related the fact that Stoneking gave him information concerning organized crime activities in Southern Illinois and the St. Louis, Missouri area. This testimony was elicited by the government as background information concerning how the FBI came into contact with Stoneking. On cross-examination defense counsel asked Agent Fox about the conversations in prison:

"Q. Now it's customary, is it not, in your agency in the Federal Bureau of

Investigation to make reports of your activities, isn't it?

A. Yes it is.

Q. And did you make out any reports concerning the negotiations that you had with Mr. Stoneking leading up to his release from the penitentiary?

A. No I didn't.

Q. Did any other agent do that?

A. No.

Q. That is unusual, isn't it, not to make reports?

A. Not concerning talking to cooperative witness. I made a report of whatever he told me concerning any criminal information that he gave me.

Q. You mean before or after his release?

A. Some were before.

Q. So you did make some reports then of the discussions that you had with him before he was released from the penitentiary?

A. Yes I did.

Q. And those are the same conversations that you testified to earlier that you had with him while he was in the penitentiary?

A. Yes."

The defense counsel then moved for production of all of the FBI reports documenting the conversation that the agents had with Stoneking, but the district court denied this request after the government assured the court that it had turned over *all of* the FBI reports and information contained therein concerning the defendant Allen to defense counsel. After Agent Fox was excused from the stand, Stoneking testified as to his role in the undercover operation. He stated that while imprisoned in early 1982 he contacted the FBI to request help in arranging his transfer from the federal penitentiary in Terre Haute, Indiana to the federal penitentiary in Springfield, Missouri in order that he might be closer to his family. He informed the FBI that he could possibly provide informa-

tion on organized crime activities in the St. Louis area. After his transfer to the Springfield facility, he gave the FBI information concerning several bombings in the St. Louis area. He further testified that after his release from prison in September 1982 he began to work as an informant for the FBI during the next two and one-half years. He subsequently met Allen in June, 1983, through Stam, a mutual acquaintance of both Allen and Stoneking. The remainder of Stoneking's testimony concerned the topics of those subsequent conversations between himself and Allen and the introduction of the tape recordings made of several of those conversations.[1] On cross-examination the following colloquy took place between defense counsel and Stoneking:

Q. Okay. Then after you got out, you had some [sic] numerous conversations with the F.B.I., is that right?

A. Yes I did.

Q. And you gave them information as to what you knew about the activities in this area, right?

A. Yes, sir.

Q. And during that time, were they making notes when you would talk with them?

A. Yes, sir.

Q. And these are the conversations that you mentioned this morning when you testified about the various interviews that you had with F.B.I. agents, correct?

A. Yes, sir.

MR. BARRIS: Your Honor at this time I would request that the notes and reports concerning these interviews be furnished pursuant pursuant to Sec. 3500.

THE COURT: Yes and I ask the government to give the attorney for the defendant all of the Jencks Act material that is available, if you haven't already done so.

---

1. His only other testimony on direct examination concerning the role of the FBI in this case was that the FBI would set the tape recording

devices in his car prior to his meetings with the defendant Allen.

MR. PROUD: Every scrap of paper that concerns [Allen] has been given to Mr. Barris, Your Honor.

\* \* \* \* \* \*

MR. PROUD: I understand it very well, Your Honor. He has everything that pertains to [Allen]. The government sees this perhaps as some kind of discovery device for other cases.

THE COURT: And you know at this juncture, Mr. Barris, I think I would have to accept the government's representation to the Court in this regard.

The Jencks Act "requires the government to produce, upon the motion of the defendant after the witnesses testified on direct examination any statements of the witness it may have relating to the subject matter as to which the witness has testified." *United States v. Balistrieri,* 779 F.2d 1191, 1217 (7th Cir.1985); 18 U.S.C. § 3500. A statement is defined, in part, under the Jencks Act as "(1) a *written statement made by said witness* and *signed or* otherwise *adopted* or *approved* by him." 18 U.S.C. § 3500(e)(1) (emphasis added). If the defendant moves for the production of a witness's statement at trial pursuant to the Jencks Act and the government contends that the requested document does not contain a "statement" then the court may order the statement to be produced for an *in camera* inspection. *See Goldberg v. United States,* 425 U.S. 94, 108, 96 S.Ct. 1338, 1347, 47 L.Ed.2d 603 (1976). If the statement sought to be produced qualifies as a "statement" under the Jencks Act but the government claims that it "does not relate to" the subject matter of the testimony of the witness then the court *must* order the statement to be produced for *in camera* inspection to determine the relevance of the statement. 18 U.S.C. § 3500(c).

Based upon their expansive interpretation of the Jencks Act, the majority remands this case to the trial court for an *in camera* inspection of the FBI reports filed by Agent Fox, apparently to determine if those reports are relevant to the testimony given by Stoneking in this case. I use the word "apparently" as I am at a loss to understand the parameters of the majority holding. At one point the majority apparently holds that this case should be remanded for an *in camera* inspection to determine if the FBI reports of organized crime in the St. Louis area not concerning Allen are "statements" within the meaning of the Jencks Act. *See* majority opinion at 995. Later in their opinion, the majority states that the remand for an *in camera* inspection is to determine the relevancy of the documents: "We need not find those reports were clearly statements, but only that because of precedent the district court had a responsibility to examine them. In addition because it is not denied that they exist and because as FBI reports they may be 'statements,' *the only remaining question is one of relevancy.*" Majority opinion at 998 (emphasis added). *See also* majority opinion at 1000. The problem with the majority's approach is that they make mention of the precedent but fail to properly apply it as they assume a sufficient foundation was established at trial to compel production of the FBI reports for an *in camera* inspection. Because it remands this case for an *in camera* inspection of the FBI reports even though the defendant failed to establish the required minimal foundation to justify application of the Jencks Act discovery rules—that the FBI reports qualified as "statements" and that the reports related to "the subject matter of the testimony," as required by 18 U.S.C. § 3500(b)—I am confident that the majority's unwarranted expansion of the Jencks Act discovery rules will unnecessarily increase the workload of the already overburdened district courts and cause undue disruptions in the administration of justice in future criminal trials. Accordingly, I dissent.

## II

In *United States v. Robinson,* 585 F.2d 274 (7th Cir.1978) (en banc), the government informant testified at trial that the defendant had killed a man on a highway in Indiana. The trial testimony revealed that

the informant and the FBI were in daily contact with each other prior to the killing and that the FBI agent took extensive notes at these meetings. The defendant moved for production of the FBI notes contending that these documents fell within the Jencks Act discovery rules and that it was error for the district court to deny his request without first making an *in camera* inspection of the documents. In upholding the district court's decision refusing to grant the defendant's motion for an *in camera* inspection, we noted that the Jencks Act was an attempt on the part of Congress "to balance Government's interest in limiting and regulating defense access to Government files against a defendant's 'entitle[ment] to relevant and competent reports and statements in possession of the Government touching the events and activities as to which a Government witness has testified at trial....' " *Id.* at 280 (quoting S.Rep. No. 981, 85th Cong. 1st Sess. 3, *reprinted in* [1957] U.S. Code Cong. & Adm. News, p. 1862). In order to achieve these twin goals, we stated that a defendant must initially:

> "meet the burden of specifying with reasonable particularity (normally by his cross-examination at trial) that a certain document exists, and that there is reason to believe that the document is a statutory 'statement,' and that the Government failed to provide it in violation of the Act. *Goldberg v. United States*, 425 U.S. 94, 116, 96 S.Ct. 1338 [1350], 47 L.Ed.2d 603 (1976) (Powell, J. concurring). Upon such a showing, a court must then conduct an *in camera* inspection to determine whether the document is both relevant and a competent 'statement' under the Act."

*Id.* at 280–81. In *Robinson* the court properly held that the defendant failed to establish the requisite foundation at trial to justify an *in camera* inspection of the FBI reports as the defendant had failed to provide any evidence as to the existence of any documented conversations between the FBI agent and the informant other than those that had previously been turned over to the defendant. It is particularly noteworthy that in *Robinson* we cited Justice Powell's concurrence in *Goldberg* discussing the necessary foundation testimony that must be set forth at trial before a district court will be required to hold an *in camera* hearing to review a government document.

In *Goldberg, supra,* the defendant was indicted and convicted of mail fraud. A cohort of the defendant pled guilty prior to trial and agreed to testify for the government. In preparing for trial, the government prosecutors extensively interviewed this person and made notes of those conversations. At trial, the defendant moved for production of those notes under the Jencks Act after the witness testified on cross-examination that those notes were *"occasionally read back"* to him to insure the correctness of the information. *Goldberg,* 425 U.S. at 100, 96 S.Ct. at 1343. The Supreme Court reversed the district court's determination that the notes were the protected work product of the government prosecutor and remanded the case to the district court for an *in camera* inspection as to whether the notes were "statements" of the witness within the meaning of the Jencks Act, noting that the witness's "testimony raised a sufficient question under the Act to require the trial judge to conduct such an inquiry...." *Id.* at 109, 96 S.Ct. at 1347. Justice Powell concurred in the result since the district court erroneously denied the motion based upon the work product privilege. His concurrence, cited with approval by our court in *Robinson,* emphasized the need to establish the proper foundation at trial through questioning of the witness to justify interrupting an ongoing trial to examine government documents *in camera:*

> "[T]he fact that the interview notes frequently will not be producible means that collateral proceedings into their producibility should not be required unless there is good reason to believe they may be 'statements.' In this light, it is evident that Newman's *cursory and ambiguous testimony was wholly insufficient to require the judge to interrupt the trial and conduct a collateral inquiry,* for it

showed nothing more than discussions of the general substance of what the witness [had] said.

\* \* \* \* \* \*

*A showing as generalized as this should never be sufficient to require the trial judge to conduct collateral proceedings on the producibility of prosecutor's notes.* If it is, collateral inquiry always will be required, for competent prosecutors rarely will go to trial that such 'discussions of the general substance' with key witnesses and the related taking of notes to be used in the examination of such witnesses.... *The 'needless trial of collateral and confusing issues' that the Court's approach encourages is not necessary for 'assuring that utmost fairness to the criminal defendant' in the administration of the Jencks Act."*

*Id.* at 119–20, 122, 96 S.Ct. at 1352–53, 1353 (emphasis added). In emphasizing the need for a proper foundation prior to a request for application of the Jencks Act discovery rules, Justice Powell noted that the initial burden must be placed on the defendant to demonstrate the need for the *in camera* inspection:

"The proper administration of the Act requires that the defendant meet an initial burden of showing that collateral inquiry is necessary to protect his rights under the Act.... This requirement also is appropriate because the trial should not be interrupted for collateral proceedings absent a genuine need for them....

The burden on the moving defendant is not to prove the existence of a statutory 'statement.' The purpose of the collateral proceedings is to resolve that issue. Rather, the *burden is simply to establish by probative evidence*—usually in cross-examination of the witness alleged to have given a statement—that there is reason to believe *that a statutory 'statement' may exist.* Certainly more must be shown than a speculative possibility. If, as here, the defendant's theory is that a prosecutor's notes meet the require-

ments of subsection (e)(1), the *questions must be asked the witness that focus on whether there was in fact an 'adoption or approval'* of a specific statement, rather than general concurrences in the correctness of the prosecutor's understanding of what the witness knows. *Absent explicit answers to such questions that satisfy the defendant's burden, the trial judge should deny the motion for production without the collateral proceeding."*

*Id.* at 123–24, 96 S.Ct. at 1354 (emphasis added).

Our court in *Robinson* and Justice Powell's concurrence in *Goldberg* emphasized the need for the defendant to establish the possibility that the requested information is a statement within the meaning of the Jencks Act so as to justify interrupting a trial to conduct a discovery mini-trial in the judge's chambers. Our concern as expressed in *Robinson* over interrupting a criminal trial to conduct a separate mini-discovery trial is consistent with the purpose of Jencks Act to regulate the defendant's access to government files to provide only that information to the defendant that could be useful as impeachment evidence at trial. *See Palermo v. United States,* 360 U.S. 343, 349, 354, 79 S.Ct. 1217, 1223, 1225, 3 L.Ed.2d 1287 (1959). The Jencks Act is not concerned with the production of exculpatory evidence rather it is to be used as an *adjunct* to *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), which protects the defendant's right to exculpatory information. *See also United States v. Navarro,* 737 F.2d 625, 631 (7th Cir.1984) (requiring the government to produce all exculpatory evidence prior to trial). Therefore, it is incumbent that the defendant provide a sufficient evidentiary foundation at trial through a thorough cross-examination of the witness to demonstrate that there is a sufficient basis for halting the trial to compel the trial judge to review the requested documents *in camera* to determine if they contain impeachable material. This burden is consistent with our court's admonishment that a trial of

collateral issues not bearing directly on the guilt or innocence of the defendant are to be avoided. *See United States v. Rovetuso*, 768 F.2d 809, 817 (7th Cir.1985) (noting that our circuit does not allow impeachment by contradiction through the use of extrinsic evidence as to collateral matters elicited on cross-examination).

### III

The majority holds that the defense counsel established a sufficient evidentiary foundation to justify an *in camera* hearing based on the fact that the defense counsel elicited on cross-examination of Stoneking and Agent Fox that Fox had merely filed reports of his conversations between himself and Stoneking relating to underworld activity in the St. Louis area. In justifying this holding, the majority states that:

> "It is difficult to establish a particular bright line level of specificity that must be met by defense counsel to demonstrate that the information he seeks is a Jencks Act statement. *It is clear that the more obvious it is that the statement is a Jencks Act statement, the less specific the foundation laid must be to meet the defense counsel's burden of particularity."*

Majority opinion at 996 (emphasis added). The majority's apparent concern is that if the defendant has not been able to review the government reports it is impossible for him to make a specific request to see a particular document and thus "the more obvious the statement is a Jencks Act statement, the less specific the foundation laid must be to meet the defense counsel's burden of particularity." This position encompasses an erroneous assumption that an FBI report, on its face, normally qualifies as a Jencks Act statement. Further, the majority's holding fails to consider the purpose behind Jencks Act discovery rules that are designed to provide the defendant with impeachment material, if it exists, and is not to be used as a broad discovery device by defense counsel. I will initially address the majority's failure to consider the purpose behind the Jencks Act.

The purpose of the Jencks Act is to produce statements to the defendant to be used to impeach government witnesses. *Palermo*, 360 U.S. at 349, 79 S.Ct. at 1223. If the witness has not yet testified as to any substantive matters at trial that relate to his discussions with the government agents, then the statements should not and need not be produced under the Jencks Act as no foundation has been developed in the record to impeach the substantive testimony of the witness. The clear and unambiguous language of the Jencks Act mandates that it is not applicable until such time as the witness has offered testimony that might be impeached. Thus, under subsection (b) the United States is only required to produce those statements "which relate to *the subject matter as to which the witness has testified."* For example, in *Goldberg, supra,* the prosecution witness identified the defendant as the person engaged in the criminal conduct. The Supreme Court held that a sufficient basis in the record had been developed for the court to hold an *in camera* examination of the government documents concerning the witness's discussions with government prosecutors since the witness testified that he had previously reviewed the government's notes of his conversations for accuracy. Thus, if the reports in *Goldberg* qualified as statements (an issue to be determined upon remand) the statements might very well have provided impeachment material if the "statement relate[d] to the subject matter of the testimony of the witness." 18 U.S.C. § 3500(b). In *Goldberg* the possibility existed that those prosecutor's notes contained material that could impeach the testimony of the witness implicating the defendant. In *United States v. O'Brien*, 444 F.2d 1082 (7th Cir.1971), FBI agents testified on direct examination detailing the defendant's activities during the time of the indictment. On cross-examination it was disclosed that they had the defendants under surveillance for a period of time prior to the time period contained in the indictment. Our court remanded the case to the district court for an *in camera* inspection of the reports stating:

"whether the statements in question 're-lated to' the direct testimony of the wit-nesses, it must relate *generally to the events and activities testified to....* [And] that within the context of the cir-cumstances surrounding the continuing nature of entire transaction as it relates to the investigation and surveillance, the trial court erred in ruling as a matter of law that the statements in question were not producible...."

*Id.* at 1086 (citations omitted). Thus, under the circumstances in *O'Brien* a remand for an *in camera* inspection was necessary to determine if the report "related to" the agents' testimony concerning their observa-tions of the defendant. But if the witness has not testified or offered the "subject matter of the testimony" there is no testi-mony in the record upon which an effort to impeach the witness can be based.

In our case, the government offered the testimony of Agent Fox to establish how Stoneking became an informant for the government. Fox testified that he was contacted by Stoneking, who was then con-fined in prison. Stoneking told Fox that he could provide information concerning orga-nized criminal activities in the St. Louis area if Fox could help arrange a transfer to a Federal Penitentiary closer to Stonek-ing's home. Fox testified that Stoneking did provide him with information concern-ing the car bombings in the St. Louis area and "organized crime activities" in the St. Louis area, (Tr. 88–89) but the agent did not testify as to the substance of any of these conversations.[2] The agent said noth-ing relating to or mentioning the defendant in these reports nor was the agent queried on cross-examination as to any of the de-tails of these conversations. Thus no foun-dation for any possible impeachment was established. Defense counsel, however,

sought to discover these reports filed with the FBI regarding this information con-cerning organized crime in the St. Louis area, but which did not concern defendant Allen. This evidence is not discoverable under the Jencks Act since the agent has not offered any substantive testimony on direct examination that could be impeached by these reports.[3] Agent Fox did testify that Stoneking was not required, as a con-dition of his early release from prison, to work for the FBI and one could argue that his reports may contain information as to any deal struck with the FBI concerning Stoneking's cooperation with the govern-ment that could be used to impeach his testimony. But Agent Fox *explicitly stat-ed* that he did not file any reports concern-ing his negotiations with Stoneking regard-ing the conditions attached to Stoneking's release from prison and thus no discover-able Jencks Act material exists that could impeach his testimony. Stoneking also tes-tified on direct examination that he met with Agent Fox in prison and presented information regarding car bombings in the St. Louis area but he did not testify to the details of these conversations or that he had in any way participated in the criminal activity; he further testified that he worked as an informant for the FBI for two and one-half years following his re-lease from prison. The remainder of his direct testimony concerned his contacts with Allen in the summer of 1983, subse-quent to his release from prison. Again, Stoneking did not offer any substantive testimony as to his conversations with the FBI agent and thus there is absolutely no testimony in the record from my perusal of the same that could be impeached by these reports. The majority assumes that mere-ly because the FBI filed a report detailing its conversations with Stoneking for pur-

---

**2.** In fact, Agent Fox only testified that he filed reports of his conversations with Stoneking af-ter Stoneking left prison when quizzed by de-fense counsel on cross-examination.

**3.** Unlike the situation in *O'Brien* where the agents testified on direct examination as to the defendant's activities during the time of the in-dictment, but also filed reports concerning the

defendant's activities prior to the indictment, the reports filed by Agent Fox of his conversa-tions with Stoneking while he was in prison can in no way relate to the defendant as Stoneking did not meet Allen until June 1983, some nine months after Stoneking was released from pris-on.

poses of documenting their continuous investigation into organized crime in the St. Louis area that these reports automatically become subject to the Jencks Act discovery rules. If, however, the witness has not offered any substantive testimony relating to those conversations (and as in this case those conversations took place prior to the witness being introduced to the defendant) there is no testimony in the record to impeach.[4]

The majority also erroneously assumes that the FBI report qualifies as a statement under the Jencks Act. The record discloses that defense counsel failed to lay the requisite foundation, as required by this court's decision in *Robinson,* to justify this assumption. As previously noted a "statement" is defined as "a written statement made by said witness and signed or otherwise adopted or approved by him...." 18 U.S.C. § 3500(e). Stoneking testified that he had "conversations" with Agent Fox concerning organized criminal activities in the St. Louis area while he was in prison and that the FBI took notes of these conversations. To qualify as statements that could be used to impeach Stoneking at trial, the defendant must establish that these statements were signed or otherwise approved by Stoneking. Defense counsel failed to ask Stoneking whether or not he (1) wrote any statement for the FBI; (2) adopted or signed any statement for the FBI; (3) read any statement recorded or transcribed; or (4) had any statement read back to him for his approval by the agent. Thus, defense counsel failed to establish very basic Jencks Act foundation demonstrating that Stoneking signed or approved of any statement recorded in the FBI reports to justify his conclusion that the report contained Jencks Act "statements." *See Goldberg,* 425 U.S. at 124, 96 S.Ct. at 1354 (Powell, J., concurring).[5] If defense counsel had asked Stoneking whether he signed, adopted or even read part of the conversations recorded by the FBI, and Stoneking answered that he had not, then the issue whether the reports qualified as statements pursuant to the Jencks Act would be moot as any recorded conversation not approved by the witness Stoneking could not be used to impeach him. Defense counsel failed to lay any foundation, much less the requisite foundation, to come within the broadest perimeter of the Jencks Act. If the defendant fails to establish the requisite foundation through proper cross-examination, he cannot complain on appeal that the district court's ruling is erroneous. *See United States v. Rovetuso,* 768 F.2d 809, 817 (7th Cir.1985). Indeed, this case is analogous to those cases where we have consistently held that the failure to make a specific objection at trial waives the right to raise the argument on appeal: "Because defendants failed at trial to raise [the issue] ... as a possible bar to the admissibility of the [evidence], defendants have waived that objection on appeal." *United States v. Laughlin,* 772 F.2d 1382, 1392 (7th Cir.1985); *United States v. Hickerson,* 732 F.2d 611 (7th Cir.1984). As this court has previously stated, "it is not the responsibility of the prosecutor or judge to do the work of the defense counsel." *Ruiz v. Cady,* 710 F.2d 1214, 1218 (7th Cir.1983).

---

4. For example, if a witness, as in this case, merely testifies to the fact that a conversation took place between himself and the government agent but did not detail the subject of that conversation, counsel could not introduce the government report detailing that conversation as there is nothing in the witness's testimony in the record to impeach. If, on the other hand, the witness testifies as to the details of his conversation with the government agent, any report that the government filed regarding this conversation (assuming it qualifies as a statement) if it involves the defendant personally or any of his activities now before the court is subject to the Jencks Act discovery rules since it may be used to impeach the witness's testimony. Of course, the government may contend that the report does not "relate to" the subject matter of the testimony and in such a case the court must examine the document *in camera* to determine its relevancy. 18 U.S.C. 3500(c).

5. Even the majority in *Goldberg* recognize that some foundation must be established at trial to justify an *in camera* hearing. *See Goldberg,* 425 U.S. at 100, 109, 96 S.Ct. at 1343, 1347.

To avoid the problem concerning the insufficiency of the foundation at trial and to justify the conclusion that the contents of the FBI report sought by the defendant qualify as statements within the meaning of the Jencks Act, the majority assumes that the FBI reports are statements simply because Agent Fox testified at trial:

> "We need not find that those reports clearly were statements, but only that because of precedent the district court had a responsibility to examine them. *In addition, because it is not denied that they exist, and because as FBI reports they may be 'statements,' the only remaining question is one of relevancy.*"

Majority opinion at 998 (emphasis added). *See also* majority opinion at 996 noting that "investigators' reports, such as FBI agents' reports, so clearly fall within the language of the Jencks Act ... that defense counsel need not establish that the report is signed by the witness to demonstrate that it qualifies as a Jencks statement." I am at a loss to understand as to how the majority arrives at the conclusion "FBI reports" will usually qualify as statements within the meaning of the Jencks Act simply because an FBI agent testifies at trial. In *Robinson*, our court expressly disapproved of the broad discovery rule advocated by the majority opinion:

> "Robinson made the claim for the first time at oral argument that since Mitchell [an FBI agent] had testified as a witness, any material in the documents written by him also constituted section 3500 material. This argument fails for two reasons. First, no specific documents were identified at trial. *Second, 'endorsement of this broad right would require either wholesale turnover of FBI files to any defendant on demand or, at a minimum that the trial judge examine for relevance and materiality all the reports filed by any government agent who took the witness stand.... [W]e decline appellant's invitation to adopt such a broad (and unnecessarily unilateral) discovery rule.'*"

*Robinson*, 585 F.2d at 281 n. 10 (quoting *United States v. Nickell*, 552 F.2d 684, 689 (6th Cir.1977), *cert. denied*, 436 U.S. 904, 98 S.Ct. 2233, 56 L.Ed.2d 402 (1978) (emphasis added)). Further, the majority reference to "precedent" is a bit mystifying as they have failed to cite a single case from any other circuit holding that FBI reports of themselves will ordinarily qualify as Jencks Act statements simply because an FBI agent testified at trial, thus justifying a request for an *in camera* inspection of those documents.[6] Also, as previously not-

---

6. The majority states that the role of our appellate court is not to "definitively determine that a document we have not seen is or is not a 'statement.'" The majority either inadvertently or advisedly misconstrues the entire thrust of my dissent that defense counsel in this case failed to establish a proper foundation to support the Jencks Act request he made. We have not seen the specific FBI reports but the testimony concerning them clearly delineates and explains their content; specifically that they do not deal with any of the facts concerning the case in controversy. It is interesting to note that the majority does not at any time contest this in their finding that the reports have met the "minimal burden." The reports describe conversations between FBI agents and the informant as to the content of the information he gave to the FBI concerning organized crime activities in the southern Illinois and St. Louis, Missouri areas. There is no testimony even remotely referring to the defendant Allen or the facts of this case. Thus, as pointed out in my dissent which the majority attempts to confuse in discussing the Jencks Act request, defense counsel, in failing to establish the relation of the reports to Allen's case, failed to lay a proper foundation for his Jencks Act request. The majority, in creating a new "low level foundation" requirement is not supported in case law and completely ignores the requirements of the Jencks Act and the specific Congressional intent that the subject matter of the document requested must pertain to the subject matter of the testimony adduced at trial. The fact that the legislative history of the Jencks Act demonstrates that Congress intended the Act to "reaffirm" the Supreme Court's decision in *Jencks* does not, as the majority contends, show that the Congress considered FBI reports as a "prime example of [a] document" that would qualify as a statement. The *Jencks* case simply held that the government must turn over documents whose contents relate to the subject matter of the testimony at trial. That is precisely what I argue in this dissent: defense counsel must lay a proper foundation for a Jencks Act request. Allowing defense counsel to request documents merely

ed, the credibility of Agent Fox was not an issue at trial since Stoneking was the person who had the contact with the defendant Allen, and who had allegedly "coerced" Allen into committing the crimes charged in the indictment. Agent Fox did testify at trial that Stoneking was not required to work for the FBI as an informant as a condition of his release from prison and thus the only possible manner in which his reports could be used to impeach him would be to demonstrate that he did in fact condition his help in securing Stoneking's early release upon Stoneking's express promise to act as an informant for the FBI. However, the agent expressly stated that he did not file any reports concerning the negotiations he had with Stoneking leading to Stoneking's release from prison.[7] Tr. at 125.

## IV

From the innocuous questions asked of Stoneking inquiring as to whether he had "conversations" with the FBI and whether the FBI took notes of these conversations, and Stoneking's affirmative response, the majority still holds that the Jencks Act discovery rules apply to the FBI reports in this case. Such a position, I fear, will lead to abuses and unnecessary delays in trials as attorneys may now stop a trial dead in its tracks and require our already over-burdened district courts to conduct *in camera* inspections of government files without the defense attorney initially even establishing sufficient reasons through proper cross-ex-

amination of government witnesses to justify such a request. This unnecessary, unwarranted interference of a criminal trial was not the intent of Jencks Act. Further, an added danger of encouraging "fishing expeditions" through government files is especially apparent in this case as the government attorney noted at trial that defense counsel represented several other defendants in pending trials with ties to organized crime in the St. Louis area and that:

> "The government is in possession of voluminous reports and tape recordings and other materials where Mr. Stoneking has been talking to the F.B.I. over this long period of time. These *concern other criminal* matters ... the *government characterized this [defense request for Stoneking's statements] as a discovery device for other reasons.*" (Tr. 159).

Because the majority engages in an unwarranted and unduly expansive interpretation of the Jencks Act discovery rules to accommodate the defendants' obvious "fishing" and exploration expedition into the FBI files, I dissent.

---

on the basis of testimony that conversations unrelated to the case took place encourages "fishing expeditions" by defense counsel that will unnecessarily interfere with a criminal trial, contrary to the majority's assertion that its "narrow holding" does not "catapult the Jencks Act into a broad discovery device." The extra burden a decision of this nature places on the federal courts is too obvious. The majority's creation of a "low level foundation" and its minimal burden requirement as well as the majority's misleading construction of legislative intent are nothing but unsupported conclusions without recitation of any basis in law or the facts of this case.

7. I am not, as the majority contends, "merely accepting the government's assertions" as to

what the FBI reports contain. Defense counsel was required to establish and failed to establish in his alleged foundational request for the Jencks Act material that the documents he sought had any relevance to Allen, much less his (Allen's) asserted defense. Counsel for Allen was required to demonstrate with at least some particularity what the relationship was between the documents requested and Allen's defense. To hold that the ambiguous and innocuous testimony defense counsel elicited from the informant and the agent was sufficient to support a Jencks Act request will force judges to examine documents any time defense counsel wants to "go fishing" in the government's files. In effect, the majority has given an open invitation to the criminal defense bar to engage in a needless "fishing expedition."