**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Timothy THREW, Defendant–Appellant.**

**No. 88–1157.**

United States Court of Appeals, Seventh Circuit.

Argued May 25, 1988.

Decided Nov. 16, 1988.

As Amended Nov. 18, 1988.
Rehearing and Rehearing En Banc Denied Jan. 24, 1989.

Richard H. Parsons, Richard H. Parsons Law Office, Peoria, Ill., for defendant-appellant.

K. Tate Chambers, Asst. U.S. Atty., Peoria, Ill., William Roberts, U.S. Atty., for plaintiff-appellee.

Before WOOD, Jr. and FLAUM, Circuit Judges, and WILL, Senior District Judge.*

FLAUM, Circuit Judge.

The defendant-appellant, Timothy Threw, pled guilty to one count of knowingly and intentionally manufacturing marijuana, in violation of 21 U.S.C. § 841(a)(1). He appeals from the district court's imposition of a 10-year term of imprisonment followed by a 5-year special parole term, contending that the district court's sentence is so excessive as to constitute a violation of the eighth amendment's proscription against cruel and unusual punishment. Threw further claims that the harshness of the sen-

tence is a direct result of the government's failure to abide by the terms and conditions of a "proffer letter" furnished to Threw prior to his agreeing to plead guilty. We affirm, but not without some misgivings.

I.

At the time of his arrest on August 18, 1987, Timothy Threw was 30 years old, possessed no criminal record, and had been a self-employed farmer in Knox County, Illinois, for about a decade. Threw was charged with knowingly manufacturing marijuana and entered an initial plea of not guilty. In the ensuing days, Threw participated in preliminary discussions with the government aimed at securing his cooperation in other ongoing investigations in exchange for a guilty plea with a promise that any and all assistance that he rendered would be presented to the court for consideration at sentencing.

As is often the case, and apparently the custom in the Central District of Illinois, Threw's negotiations with the government were conducted pursuant to a "proffer letter." The purpose of such a letter, according to the government, ordinarily is to ensure that in the event a cooperating defendant decides not to plead guilty, any information he may have "proffered" to the government cannot later be used against him at trial unless it can be shown that such information was independently obtained.[1] While proffer letters are thus intended primarily to protect those who ultimately choose *not* to cooperate with the government, the language of the letter agreed to in this case strongly implied that the government was equally constrained from using the information obtained from Threw against him in subsequent proceedings if he continued to cooperate and ultimately pled guilty. Specifically, the August 25 proffer letter provided, in part:

* The Honorable Hubert L. Will, Senior District Judge of the United States District Court for the Northern District of Illinois, is sitting by designation.

1. *Cf. Kastigar v. United States,* 406 U.S. 441, 460, 92 S.Ct. 1653, 1665, 32 L.Ed.2d 212 (1972) (prosecution must affirmatively demonstrate that evidence it proposes to use against an immunized witness is derived from "a legitimate source wholly independent of the compelled testimony"). Threw's proffer letter, however, contained language which expressly permitted the government to make "derivative use" of Threw's cooperation without first having to comply with *Kastigar* and its progeny. *See infra* at 1050.

In order to assure that there are no misunderstandings concerning the meaning of this proffer, I [the Assistant United States Attorney] am writing to clarify the ground rules for any proffer with your client. First, no statements made by or other information provided by your client during the proffer will be used against your client in any criminal case.

The substance of Threw's proffer revealed to the government for the first time that his cultivating and manufacturing activities actually began in 1984, instead of the spring of 1987 as the government had charged. The proffer also disclosed the total amount of marijuana Threw harvested as well as the considerable profits he realized.

On August 27, Threw withdrew his not guilty plea and instead entered a plea of guilty to one count of manufacturing over 50 kilograms of marijuana during the spring and autumn of 1987. Two paragraphs of Threw's plea agreement contained language at least partially contradicting the government's proffer letter. Paragraph 12 of the plea agreement stated that the United States Attorney's Office would "fully apprise the District Court and the United States Probation Office of the nature, scope, and extent of defendant's conduct regarding the charge against him, and related matters, including all matters in aggravation and mitigation relevant to the issue of sentencing." Paragraph 16 of the plea agreement acknowledged that "all information provided to the United States Attorney's Office during the course of [defendant's] cooperation will be turned over to the United States Probation Office for its preparation of a pre-sentence report."

The district judge sentenced Threw on January 15, 1988. Present at the sentencing hearing were the same counsel who had agreed to the terms of the earlier proffer letter. The court accepted the plea agreement and then proceeded to consider factors in aggravation and mitigation of sentence. Threw, the only witness to testi-

fy at the sentencing hearing, gave testimony in his own behalf while the government initially presented its evidence in mitigation *in camera*.[2] Among the factors the government later presented in aggravation of sentence was Threw's "history in growing marijuana"—a history the government had learned about *only* as the result of Threw's own disclosures pursuant to the terms of the proffer letter. The Assistance United States Attorney told the court:

Another aggravating factor that applies to the history in [sic] growing marijuana, in 1985 he along with another individual planted, cultivated, manicured and sold approximately 30 to 40 pounds of marijuana realizing a profit of $20,000 to $30,000. In 1986 he planted, cultivated and sold approximately a hundred to 150 pounds of marijuana, making an estimated profit of 60 to $90,000 in one year. In 1987 he expected to harvest 850 pounds of marijuana which, your Honor, have been sold somewhere here mostly in the Central District of Illinois and realized a profit of $250,000.

The government then recommended that Threw be sentenced to no fewer than 12 years' imprisonment (a maximum of 20 years was possible) and to a special parole term of three years. Although Threw was given the opportunity to, and did in fact, object to the inclusion of certain information in the Probation Office's pre-sentence report, he did not bring to the court's attention the fact that the government had obtained some of the most damaging information in the report as a direct result of his own cooperation and in apparent violation of the proffer letter.

The district court imposed sentence at the conclusion of the parties' aggravation and mitigation presentations. In imposing a 10–year term of imprisonment with a 5–year special parole term, the court was clearly influenced by the pre-sentence report's detailed choronology of Threw's illicit agricultural endeavors. The district judge commented:

---

**2.** We presume this was done so as not to jeopardize ongoing investigations which Threw may

have facilitated by his cooperation.

In reference to the seriousness of this offense, this was an extremely serious situation. At the time that you were arrested you were into your fourth crop, as I understand it. This started in 1984 with approximately 100 marijuana plants, and in that year you realized a profit of approximately $10,000. In 1985, although I don't recall or I don't know if it was set out how many plants you had, you realized a profit of $20,000 to $30,-000, some two to three times what it had been the year before.

In 1986 you had approximately 465 plants, realized a profit of $60,000 to $90,000. So again it had doubled or tripled over the previous year. And in 1987, at the time of the arrest, the government seized approximately well over 1400 plants, which would mean approximately three times the amount that you had been involved with the year before.

So this was an operation that had multiplied by a factor of three into the fourth year. It started out with a rather significant amount to begin with. But by 1987 we are talking about a truly large operation.

\* \* \* \* \* \*

*I think it is also significant here that this is something that went on for a period of four growing seasons from 1984 to 1987* .... It not only occurred over that period of time, but there were many different decisions, many different actions that had to be made over that period of time in order to make it succeed —literally from ground up from the growing of the seeds, the planting of the seeds, the cultivation, to the watering, to the harvesting and to the manicuring to the sale. *This really truly was, and I think that is a serious aggravating factor in terms of the offense.*

(Emphasis added). It is from the district court's 10–year sentence that Threw seeks relief.

### II.

Threw raises two arguments on appeal. First, he claims that, whether considered in isolation or compared to the sentences of others charged with violations of 21 U.S.C. § 841(a)(1), his 10–year sentence is so excessive and disproportionate to the particulars of his offense that it violates the cruel and unusual punishment clause of the eighth amendment. Second, Threw argues that, at the very least, he should be entitled to resentencing due to the government's failure to abide by the terms of its proffer letter. We consider these arguments in turn.

■ Mounting a challenge to a statutorily authorized sentence is an uphill struggle. In this case, Threw's sentence of 10 years' imprisonment is exactly half the maximum allowable sentence pursuant to 21 U.S.C. § 841(a)(1). Sentences within the maximum term provided for by Congress are reviewable in this circuit only for a manifest abuse of discretion. *United States v. Ray*, 828 F.2d 399, 425 (7th Cir.1987); *United States v. Mitchell*, 788 F.2d 1232, 1237 (7th Cir.1986). A district court abuses its discretion if it relies upon inaccurate information in exercising its discretion, or fails to exercise any discretion at all. *United States v. Nesbitt*, 852 F.2d 1502 (7th Cir.1988); *United States v. Ford*, 840 F.2d 460, 466 (7th Cir.1988). Similarly, a mere showing of disparity in sentences among codefendants or among unrelated defendants sentenced for violations of an identical statute does not, without more, demonstrate an abuse of the district court's discretion. *Ray*, 828 F.2d at 426; *United States v. Peters*, 791 F.2d 1270, 1303 (7th Cir.1986). Threw's sentence may appear to be severe, but it is not unconstitutional. *See, e.g., Hutto v. Davis*, 454 U.S. 370, 102 S.Ct. 703, 70 L.Ed.2d 556 (1982) (forty-year prison term and a $20,000 fine not an unconstitutional sentence for conviction on charges of possession with intent to distribute nine ounces of marijuana; the evidence also showed that the defendant sold drugs that were to be smuggled into a prison, that he had sold drugs to an inmate's wife, and that he was previously incarcerated).

■ Threw's second argument is that the government's failure to adhere to the promises it made in its proffer letter en-

titles him to resentencing. We must admit that we are disturbed by what appears to be contradictory draftsmanship by the prosecution which, in turn, triggered the following scenario. Prior to entering into a plea agreement, Threw was required to disclose the information he hoped to exchange in return for favorable consideration. These disclosures were made pursuant to the terms of a proffer letter which assured Threw that no information revealed during such preliminary negotiations would be used against him in "any criminal case," including, as we read the letter, the present one. Having persuaded the government to accept a guilty plea, Threw was then confronted with a formal plea agreement which seemingly contradicted the proffer letter, providing that the full extent of the previously unknown information he had furnished to the government would be reported to the Probation Office for inclusion in his pre-sentence report. At that point, Threw was left to choose between (a) accepting the plea agreement and expecting that the court would be apprised of the source of the information contained in the report, the express terms of the proffer letter, and the extent of his cooperation; or (b) deciding not to enter a guilty plea and instead proceeding to trial at which the government would be bound by its proffer letter not to make direct use of Threw's cooperation against him.

While this second option might appear to have been Threw's better course of action, the government's proffer letter contained a clause permitting it to make *derivative* use of Threw's cooperation. This portion of the proffer letter stated:

> [T]he government may make derivative use of and may pursue any investigative leads suggested by any statements made by or other information provided by your client. This provision is necessary in order to eliminate the necessity for a *Kastigar* hearing at which the government would have to prove that the evidence it would introduce at trial is not tainted by any statements made by or other information provided by your client during the proffer.

In practical terms, the effect of such a provision would likely be that the government could obtain and use the same information that Threw had furnished so long as the information was not the direct result of Threw's cooperation—*i.e.*, so long as the information was obtained *derivatively* from sources provided by Threw in the course of his proffer. Faced with what amounts to a Hobson's choice, Threw accepted the plea agreement. Unfortunately for Threw, although his inculpatory disclosures made their way into the pre-sentence report, the government never informed the sentencing judge that Threw was in fact the direct source of the admissions and that he made those admissions under the obviously mistaken impression that they could not and would not be used to his detriment. We find the government's omissions, especially in light of its promises in the proffer letter, disturbing.

The government advances the view that there is nothing inconsistent between the understanding it reached with Threw in the proffer letter and the terms of the subsequent plea agreement. In the government's view, its promise in the proffer letter not to make direct use of Threw's inculpatory admissions was binding only if Threw eventually chose not to plead guilty. However, because Threw decided to enter a guilty plea, the government argues that the language of the subsequent plea agreement (*not* the terms and conditions of the previously binding proffer letter) should control. This reading of the conflicting provisions of the proffer letter and the plea agreement is unacceptable. Not only was the implication of the government's asserted interpretation never explained to Threw before he agreed to the terms of the proffer letter, but such a construction of the proffer letter may render a defendant who chooses not to plead guilty better off at the sentencing phase than one who chooses to enter a guilty plea. Moreover, even if the government had not made a plea agreement contradictory to the proffer letter, any benefit to the defendant from not using the proffer letter does so by binding the government to an agreement which it

cannot properly fulfill—the withholding of relevant information from a sentencing judge.[3] We are quite confident that if defendants in central Illinois fully understood the plea bargaining procedures that are apparently in place of their federal judicial district, their willingness to enter into such pleas would substantially diminish.[4]

Let there be no mistake, we are not troubled because the plea bargain reached between Threw and the government turned out to be a dismal deal for Threw—Federal Rule of Criminal Procedure 11 ensures that defendants enter into plea bargains knowingly and voluntarily. Rather, we are concerned because the "bargain" Threw ultimately struck appears to have been the direct result of the prosecution's ambiguous written representations. Particularly where individual liberty is at stake, there can be no place for uncertainty in the plea negotiation process.

While the government may have breached its promise to Threw not to disclose certain information to the sentencing court that it had received directly as the result of his cooperation, the sentencing court committed no error in considering that information for purposes of imposing Threw's sentence. In fact, not to have considered the information would have constituted a violation of the court's statutory duty. *See*

*supra* n. 3. Accordingly, the only avenue available to Threw for obtaining amelioration of his sentence is to file a Rule 35 Motion for Reduction of Sentence with the district court within 120 days of the issuance of this opinion. Fed.R.Crim.P. 35. The district judge has broad discretion and is uniquely qualified to assess such a request in light of the circumstances of this case.

### III.

In conclusion, we hold that the sentence imposed by the district court did not offend the eighth amendment's prohibition against cruel and unusual punishment. We also hold that the use of information contained in the proffer letter by the sentencing judge does not require a remand for resentencing.

**AFFIRMED**

WILL, Senior District Judge, dissenting.

While I agree with much of the majority opinion's observations about the impropriety of the proffer letter and the use made of it here by the government, I do not agree that the government's conduct did not result in an illegal and unconstitutional sentence.

---

**3.** To the extent that prior opinions of this circuit have either strongly intimated or concluded in *dicta* that government promises to withhold relevant information from the sentencing court are invalid, *see, e.g., United States v. Billington,* 844 F.2d 445, 451 n. 6 (7th Cir.1988); *United States v. Cook,* 668 F.2d 317, 320 and n. 4 (7th Cir. 1982), our opinion today prohibits the making of such promises in the future. *See also* 18 U.S.C. § 3661 which states:

> **Use of information for sentencing**
> No limitations shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence.

Notwithstanding our holding that a government promise to withhold relevant information from the sentencing court is invalid, if a guilty plea was induced by such an unfulfillable promise it remains equally "subject to challenge" as a plea induced by a valid promise that the government simply fails to fulfill. *Cook,* 668 F.2d at 320. The Constitution, however, does not re-

quire that a defendant be afforded any particular relief (*i.e.,* specific performance) as the result of such prosecutorial impropriety. *Billington,* 844 F.2d at 450.

**4.** The dissent believes that our result requires the government to turn over to the sentencing judge all information possessed by the government, even if the information was obtained by the government in an unconstitutional manner. The dissent further believes that the information in dispute in this case was obtained in an unconstitutional manner. Neither of these observations is appropriate.

First, the defendant's fifth amendment right against *self-incrimination* under *Miranda* was not violated because the proffer was not made in a custodial situation. Second, we do not reach the question of whether § 3661 *requires* the government to give to the sentencing judge information obtained in a manner violative of the constitution. We hold only that the government cannot shield from the sentencing judge information validly obtained pursuant to a proffer from the defendant.

There is no dispute that, if the defendant had been granted derivative use immunity, *Kastigar v. United States,* 406 U.S. 441, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972), would have precluded the government from using any of the evidence voluntarily given it by the defendant either at a trial or at sentencing.

The use of the so-called "proffer letter" in lieu of a grant of derivative use immunity makes it possible for the prosecution, as it did here, to create a "Catch–22" dilemma for a defendant. It also makes it possible for the prosecution to avoid the clear implications of *Kastigar* as well as to double-cross a defendant who accepts the proffer, bares his soul and then has his confessed sins brought forward at sentencing and made the basis for a more substantial sentence than he would otherwise have received on the offense to which he pled guilty. The United States government should be above such trickery.

Derivative use immunity provides the prosecution with all the tools it needs and, as the Court said in *Kastigar,* 406 U.S. at 458, 92 S.Ct. at 1664, it provides a defendant with all the protection the Constitution mandates. As this case demonstrates and the majority recognizes, "proffer letters" are subject to abuse and should not be utilized as a substitute for a grant of derivative use immunity.

The majority opinion holds that, while the government's conduct and double-talk was a breach of contract and unfortunate, it was not error for the government to disclose and the sentencing judge to take into consideration information obtained from the defendant which would not have been obtained without the express representation that, as *Kastigar* mandates, it would not be used against him. The majority goes so far as to state that "not to have considered the information would have constituted a violation of the court's statutory duty," referring to 18 U.S.C. § 3661.

The sentencing judge was obviously not aware that the information in aggravation presented by the government at the sentencing hearing had been obtained by false promises that it would not be used against the defendant. But the government's conduct here not only was a breach of contract, it raises a serious Fifth Amendment question.

The government obtained a waiver by Threw of his Fifth Amendment privilege against self-incrimination without advising him, as *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) requires, that anything he said might be used against him. On the contrary, he was told that it would not be so used. While 18 U.S.C. § 3661 prohibits limitations being placed on the information to be received by a court in connection with sentencing, it does not compel that all information regardless of how obtained be given to the sentencing judge. It obviously could not and does not amend the Fifth Amendment to authorize tricking a defendant into waiving his constitutional privilege nor does it reverse *Miranda* or *Kastigar.* Nor does it impose a duty on the court, as the majority apparently believes, to consider information obtained unconstitutionally. Clearly, Section 3661 must be read to be consistent with the Constitution and the decided cases. It cannot be read to compel the presentation to a court or its use by a judge of information obtained unconstitutionally.

The sentence here was clearly based in large part on information obtained by the prosecution in violation of the Fifth Amendment and which should not have been considered by the sentencing judge. I would vacate the sentence and remand for resentencing consistent herewith rather than finding the sentence valid and suggesting that Threw resort to Rule 35 and hope for a reduction in what the majority apparently agrees is an excessive sentence in a one-count first offense marijuana case.