**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Melvin MORRIS and Noah A. Spann,
Defendants–Appellants.**

**Nos. 90–1080, 90–1134.**

United States Court of Appeals,
Seventh Circuit.

Argued Jan. 22, 1991.

Decided March 18, 1992.

Rehearing and Rehearing En Banc
Denied June 3, 1992.

---

1392

David Capp, Asst. U.S. Atty. (argued), Andrew B. Baker, Jr., Asst. U.S. Atty., Dyer, Ind., for U.S.

Michael B. Nash (argued), Chicago, Ill., for Melvin Morris.

Ellen G. Robinson (argued), Robinson, Curley & Clayton, Chicago, Ill., for Noah A. Spann.

Before CUMMINGS, COFFEY and EASTERBROOK, Circuit Judges.

COFFEY, Circuit Judge.

Defendants-appellants Melvin Morris and Noah A. Spann were found guilty after a jury trial on August 31, 1989 of one count of conspiracy to defraud the United States in violation of 18 U.S.C. § 371, two counts of mail fraud in violation of 18 U.S.C. § 1341, and one count of misapplying federal revenue sharing funds in violation of 18 U.S.C. § 666(a). They contest their convictions on numerous grounds. We affirm.

## FACTS

This case involves the purchase of a nursing home facility in East Chicago, Indiana by Tri–City Comprehensive Community Mental Health Center, Inc. ("Tri–City"), a community mental health provider, using Lake County, Indiana funds and federal revenue sharing funds. The jury convicted the two appellants of misappropriating federal funds to bribe various individuals involved in the purchase of the nursing home facility and to pay an inflated purchase price for the facility.

In 1980, the state of Indiana converted a state mental hospital into a correctional facility, displacing a number of psychiatric patients. Some of these displaced patients were housed in a deteriorating nursing home facility in Lake County that provided nothing more than room and board. A dispute between the nursing home's owner and the state over the rates the nursing home charged led to the closing of the facility, requiring the emergency placement of the mental patients. Thereafter, a permanent solution for the placement of these mentally ill patients was sought.

During the time that the patient housing crisis was straining the Lake County mental health system, the owners of the East Chicago Rehabilitation Center, Inc. ("ECRC"), a nursing home in East Chicago, Lake County, Indiana, were considering selling their facility. ECRC was owned by a group of five men, including one of the appellants, attorney Melvin Morris.

The interest of the ECRC owners in selling their facility was communicated shortly thereafter to Glenn Kuipers, the executive director of Tri–City. Tri–City was one of three mental health centers in Lake County, and its operation was funded from patient fees combined with state and federal funds.[1] A sister corporation to Tri–City, the Foundation for Comprehensive Mental Health Care, Inc. ("Foundation"), was formed in 1980 to hold property for Tri–City.

Tri–City's specific responsibility within the Lake County mental health system was

---

1. Tri–City's principal office was located in East    Chicago, Indiana.

to care for those persons diagnosed as being chronically mentally ill ("CMIs"). Mental patients were classified as CMIs when the nature of their mental illness was more acute and required repeated hospitalization or occasional confinement for extended periods of time in a more structured psychiatric setting. The CMIs were among the patients most acutely affected by the mental health system's housing shortage.

As Melvin Morris and the other ECRC owners were looking for a buyer and Tri–City was seeking ways to solve the CMI problem, Noah A. Spann, the other defendant-appellant, stepped to center stage. From 1974 to 1986, Spann was one of three district commissioners of the Lake County Board of Commissioners, the governmental body in the Lake County executive branch entrusted with the authority to enter into contracts on behalf of the county and approve payment requests of county contracts.[2]

Although it required a majority vote of the three commissioners to award a contract, the commissioners had a tacit agreement among themselves that any contract within a commissioner's district would not be opposed if the local commissioner was in favor of it. Thus, the potential purchase of ECRC by Tri–City fell within Spann's designated *de facto* authority as East Chicago's commissioner.

Events began to accelerate after Kuipers, representing Tri–City, met with Commissioner Spann to discuss the purchase. Spann responded favorably to Kuipers' inquiries about the possible purchase by Tri–City of ECRC. Spann indicated that he was interested in the transaction since ECRC was located in his district. Sometime in the middle of 1982, Kuipers met with both Morris and Spann to discuss the ECRC purchase, and negotiations continued through 1983. In late 1983, after discussions with his ECRC partners, Morris proposed to Kuipers an asking price of $6,423,000 for the facility. Shortly thereafter, at a meeting between ECRC and Tri–

City officials, Morris made a presentation suggesting a per bed cost of $40,000. A Tri–City accountant characterized the proposed price as "way too high".

On December 5, 1983, Kuipers submitted a proposal to Morris for the acquisition of ECRC for a total price of $4,948,000, which included a sale price of $4,148,000, a ten month lease of ECRC by Tri–City for $500,000, and a ten-month $300,000 management contract under which ECRC would operate the facility. Morris and his partners rejected the proposal.

Kuipers then discussed the purchase price with Spann. On or about December 21, Kuipers submitted a proposal of $5,073,000, including the same previously discussed sale price of $4,148,000 and $500,000 lease, but with the management contract fee increased to $425,000. Morris and his partners accepted this proposal.

On December 31, 1983, ECRC entered into a Memorandum of Agreement with the Foundation (Tri–City's sister corporation). The memorandum provided that the parties would enter into a ten month lease of ECRC by the Foundation, with lease payments of $210,000, $160,650 and $189,350, due on December 31, 1983, February 1, 1984 and August 31, 1984, respectively. The agreement also provided that ECRC would operate the facility pursuant to a $425,000 management contract. The Foundation would purchase ECRC for $4,148,000. The total payments under the Memorandum were $5,133,000, $60,000 more than the total of the proposal Morris had accepted.

In January, 1984, Tri–City began receiving money from the County for the ECRC transaction and transferred it to the Foundation, which in turn began making payments to ECRC pursuant to the Memorandum agreement.

State regulations, however, created problems for the developing scheme. Kuipers was advised by his accounting firm that the state of Indiana, pursuant to Indiana law, would not grant a license to a facility if it

---

2. Spann's district included East Chicago, Indiana, the location of the ECRC nursing home.

was operating under a lease arrangement. Morris and Kuipers restructured the agreement into a purchase agreement, using the initial lease payment of $210,000 as an option price for the purchase. The option agreement provided for a cash purchase price for ECRC of $4,148,000 and an alternative contract sale price of $4,800,000 with monthly payments of $52,162.

The parties also negotiated a training agreement, under which ECRC would train designated representatives of the Foundation in the operation of the facility. The training fee was set at $160,650. This amount was equal to the second contemplated lease payment under the memorandum agreement. The negotiations also included other contracts to cover the remaining lease payment and the management contract provided in the memorandum agreement. These additional agreements included a temporary in-patient care contract under which 15 beds would be reserved for 351 days at ECRC for Tri–City patients for a price of $355,000. A psychiatric care agreement valued at $260,000 was also made part of the restructured transaction.

The option agreement was signed on February 1, 1984, with an expiration date in 425 days. The training agreement was signed on February 14, 1984, and eight days later the Foundation paid ECRC the $160,650 required under its terms. No one was ever trained under the agreement. Shortly thereafter, the Indiana State Board of Health, pursuant to its regulatory obligations, determined that the ECRC purchase price was excessive as the ECRC purchase price came to $34,000 per bed, far exceeding new construction costs in the area calculated on the high side at $28,000 per bed.

Undeterred, the schemers restructured the ECRC sale a third time. The original option had expired by this time and thus, on March 29, 1985, the parties entered into the "First Amended Option Agreement." The amended option agreement provided for a purchase price of $3,416,000 (lowering the per bed costs to $28,000), which was some $732,000 less than the purchase price in the original option. Morris then put together a new agreement for temporary in-patient care. This temporary in-patient care agreement provided that 30 skilled care beds would be reserved at ECRC for Foundation patients for six months, up from the previously reserved 15 beds. The agreement provided that the cost of reserving the thirty beds for Foundation patients was $104,000 per month for a total of $624,000 during the six month period. Under the agreement, the Foundation was liable for the full amount whether the beds were occupied or not.

Spann then went to the Lake County, Indiana Council and requested $1,050,000 in County funds for the acquisition of a CMI facility in 1985 for use in 1986. At a budget committee meeting of the County Council on June 6, 1985, Kuipers and Spann told the Council president that they had not yet selected a facility, even though the president specifically asked about ECRC. The commissioners allocated $1,050,000 for the purchase of ECRC, the money coming from federal revenue sharing funds. On August 30, 1985, the Foundation exercised its option under the agreement with ECRC and began paying ECRC the monthly purchase price payments of $54,590.70 per month. Subsequently, the Foundation made six monthly payments to ECRC under the temporary care agreement. The sale of ECRC was completed shortly thereafter, but in March, 1986, a federal grand jury investigation began, culminating in the indictments and convictions of Morris and Spann.

### ISSUES PRESENTED

The defendants-appellants contest their convictions on numerous grounds. They argue (1) that the evidence presented at trial was insufficient to sustain their convictions; (2) that the trial judge made several evidentiary errors; (3) that the trial judge improperly denied their motion to compel the government to produce certain FBI reports of interviews with Glenn Kuipers pursuant to the Jencks Act, 18 U.S.C. § 3500 and *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963); (4)

that Spann's convictions for conspiring to defraud the United States and for mail fraud and the misapplication of federal monies violated Wharton's rule since they involved convictions for conspiracy as well as the completed substantive offenses; and (5) that the trial judge abused his discretion sentencing the defendants.

## I. SUFFICIENCY OF THE EVIDENCE

■ Morris and Spann claim that the government failed to present evidence sufficient to support their convictions for conspiring to defraud the United States (18 U.S.C. § 371), mail fraud (18 U.S.C. § 1341) and misapplying federal revenue sharing funds (18 U.S.C. § 666(a)).

In evaluating the sufficiency of the evidence challenge, we note that the appellants bear a "heavy burden":

> "Initially, we 'review all the evidence and all the reasonable inferences that can be drawn from the evidence in the light most favorable to the government.' ... 'The test is whether after viewing the evidence in the light most favorable to the government, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.... A verdict will withstand a sufficiency of the evidence challenge unless there is no evidence from which the jury could find guilt beyond a reasonable doubt.... In appeals of jury trials such as this case, we are obliged to 'defer to reasonable inferences drawn by the jury and the weight it gave to the evidence. Likewise, we leave the credibility of witnesses solely to the jury's evaluation, absent extraordinary circumstances.... [W]e 'view the evidence in the light most favorable to the government and accept circumstantial evidence as support, even sole support, for a conviction."

*United States v. Moore*, 936 F.2d 1508, 1524 (7th Cir.) *cert. denied, Moore v. United States*, —— U.S. ——, 112 S.Ct. 607, 116 L.Ed.2d 630 (1991) (citations omitted) (emphasis in original).

With these standards for appellate review in mind, we turn to Morris' and Spann's arguments requesting that we overturn their convictions because the evidence presented in the trial court was insufficient to meet the requisite burdens of proof. The two were convicted for their participation in a scheme to sell ECRC at a grossly inflated price using public funds to finance the purchase. The government persuaded the jury that in executing their plan to sell at the inflated purchase price the defendants conspired to defraud the federal government, committed mail fraud and misapplied federal revenue sharing funds.

Central to the government's trial theory was that numerous collateral agreements the parties entered into were merely part and parcel of a fraudulent scheme to maintain the artificially high price of the ECRC sale. The government presented evidence at trial that the temporary in-patient care agreement discussed above was an integral part of the fraudulent scheme to inflate the price of the ECRC transaction. The agreement provided for the reservation of 30 beds for Tri–City in the ECRC for a 6 month period beginning August 30, 1985. Under the agreement, the Foundation (acting for Tri–City) was liable for the full $624,000 price of the reservation whether the beds were ever occupied or not. Jacqueline Beverly, former Assistant Director of Tri–City, testified that the agreement reserving beds at ECRC did not benefit Tri–City since CMI patients (ostensibly the ones for whom the beds were reserved) generally did not require nursing home bed care and confinement, but required only a minimum amount of help in supervised housing.

Further buttressing the government's characterization of the temporary in-patient care agreement as a fraudulent device to transfer funds to ECRC was the testimony of Dr. Jerry H. Henderson, an ECRC administrator. Henderson's testimony makes clear that ECRC had ample bed capacity for any additional patients. Thus, the reservation setting aside thirty beds (with guaranteed payment whether the beds were occupied or not) was unnecessary.

Evidence presented at trial demonstrated that the other collateral agreements were

as suspect as the temporary in-patient care agreement. Glenn Kuipers testified that the training agreement was created in an effort to sustain the total inflated purchase price of ECRC. The Foundation paid ECRC over $160,000 for the training agreement under which no one was ever trained. When the lease contemplated in the original agreement had to be scrapped because of state licensing problems, the funds which were to be transferred to ECRC through the second contemplated lease payment were simply rerouted through the sham training agreement.

The government argued at trial that the only purpose for any of these collateral agreements was that they maintained the agreed package price of over $5 million. Despite a 14 month span and numerous changes in types of agreements and per bed costs, the total package price remained remarkably constant. Presented with the evidence set out above, a rational trier of fact (here, the jury) could have concluded beyond a reasonable doubt that the collateral agreements were entered into merely to sustain the inflated $5 million dollar agreement.

The government also produced several witnesses who testified that the proposed price for the ECRC facility was far in excess of the cost in the comparable market. Terrance M. Hiduke, a certified public accountant hired by Tri–City to assist in the proposed purchase of ECRC, testified that he did not seek an independent appraisal of the ECRC facility because "the price was considerably above what other [comparable] facilities were being sold at." Joseph Baldus, a career health administrator with over 20 years experience with nursing homes and a project review officer with the Indiana State Board of Health assigned to review the ECRC proposal, testified that per bed costs of the facility were "a bit much higher than the norm at that time." John Dull, the Lake County attorney who investigated the costs of nursing homes in connection with the ECRC purchase, testified that he told Spann that the range of per bed costs for nursing homes in Indiana was between $13,000 and $28,000 and that the County ought to begin negotiations for the purchase of ECRC at the $13,000 range. Rather than follow Dull's negotiation recommendation, Spann's response was that the price would then be $28,000 per bed, the high end of the price range.

Other evidence offered at trial that demonstrated that the ECRC transaction was fraudulent from its inception was testimony concerning Spann's commissioning of a study to determine if the ECRC facility would be suitable for Tri–City's purposes. The study was done by Macro Systems, Inc. under a contract with Lake County. Spann, after threatening nonpayment, persuaded Macro Systems to produce a study he could use to argue for and support the purchase of ECRC by Tri–City.

This evidence served to corroborate the testimony of Glenn Kuipers, which demonstrated that the ECRC purchase price was grossly inflated and that the collateral agreements with Morris were merely a device to justify and provide a vehicle for the transfer of money to ECRC.

The government presented further evidence damaging to Morris and Spann's denials of the charge that they arranged the ECRC sale at a grossly inflated price, thus misapplying federal monies. Testimony established that the two arranged payments to Kuipers and Larry Crowel to ensure that the ECRC transaction would be consummated at the inflated price they desired. Crowel was the owner of a cleaning company which had a contract with Tri–City. Crowel paid Kuipers' girlfriend a salary without her performing any work while Kuipers, in turn, approved inflated bills from Crowel's company. Moreover, from 1982–1984, Crowel paid Spann $1,000 per month to maintain his janitorial contract with Lake County. As a result of these machinations, Crowel was able to be of assistance in the ECRC transaction because of his dealings with both Kuipers and Spann.

Kuipers testified that because of Crowel's relationship with Spann he asked Crowel to join him in approaching Spann about receiving payments in connection with the ECRC transaction. Kuipers and Crowel

testified that they met Spann at a restaurant on December 21, 1983. Crowel told Spann that he and Kuipers wanted $120,000 from the ECRC deal, with payment of half of the agreed amount up front and half at the completion of the transaction. Kuipers requested the bribe from Spann based on the fact that this transaction would be a political coup for Spann. Kuipers testified that Crowel believed he was entitled to the money because of the kickbacks he had been paying Spann. Spann responded favorably to the proposed $120,000 payment, but advised Kuipers and Crowel that he would have to discuss it with others before agreeing to it.

Part of this contemplated payment was eventually paid, although Kuipers and Crowel gave diverging accounts of the transaction. In early February 1984, Crowel met Kuipers in a restaurant and gave him a bag of money. Kuipers testified that Crowel told him that he was giving him his half of the $60,000. Crowel testified that he received two bags of money from Spann in Spann's office and that he gave Kuipers his half, amounting to $12,500.

Crowel's receipt of his share of the payment was corroborated by a false invoice he created masking the income as part of a real estate transaction. It was also evidenced by his safety deposit box records, and by the fact that Crowel reported the receipt of this money on his 1984 tax return.

Other evidence supported the testimony that Morris and Spann had agreed to make the payment to Kuipers and Crowel. On December 21, 1983, a final proposal for purchase totalling $5,073,000 was agreed to by Morris. Ten days later, the parties entered into the memorandum agreement totaling $5,133,000. The difference between these two amounts is $60,000. A jury could have reasonably concluded that this amount was to cover the $60,000 up-front payment.

Moreover, Kuipers testified that in November, 1984, Crowel called and said that he had received another package of money. Kuipers testified that Crowel gave him

$30,000 from this second payment. Crowel also testified that there was a second transfer of money. He stated that the amount was $35,000, but could not recall the particulars of the transaction. Crowel had previously testified that he had received $60,000 in one transaction. In addition, Kuipers and Crowel both testified that they met with Morris and Spann at Morris' East Chicago office to discuss the payment of the second $60,000. At this meeting the method of payment of the second payment was discussed.

Considering all this evidence, the jury could very well have concluded beyond a reasonable doubt that Morris and Spann were guilty of engineering the sale of ECRC at an inflated price, thus defrauding the federal government through the misapplication of government funds. We reject the defendants-appellants' claim that the evidence was insufficient to support their convictions.

## II. EVIDENTIARY ISSUES

Morris contends that the trial judge erred in admitting evidence pertaining to three matters. Spann joins with Morris in the first objection. We reject all three evidentiary challenges.

### A. Kuipers' note

Morris and Spann claim the trial judge committed reversible error when he admitted evidence of a note Kuipers left with his secretary. Kuipers testified that during the summer of 1984, he received a telephone call from Spann telling him to attend a meeting at Spann's home. The purpose of the meeting was to finalize the ECRC agreements. Kuipers stated that he did not recognize the address Spann gave him, and that he left a note with his secretary telling her where he was going and instructing her to contact the police if anything happened to him. His secretary, Diane Sakellaropoulos, testified that Kuipers wrote out a lengthy note, sealed it in an envelope and told her, "If you don't see me by 4:00 o'clock today, give this to the East Chicago Police Department." Kuipers re-

turned before 4:00 and retrieved the envelope containing the note.

The government argues the evidence (1) was probative of Kuipers' state of mind because it demonstrated that he was in fear for his life as he was involved in an illegal activity with respect to ECRC and (2) it corroborated his testimony that the meeting occurred. In addition, the government maintains that the evidence was probative of its contention that Spann and Morris were the controlling forces behind the inflated price scheme in that they could intimidate and force Kuipers into attending a meeting he was reluctant to attend.

Spann and Morris claim that the government elicited the testimony purely to suggest to the jury that Spann was a violent, dangerous man. They also argue that the testimony injected "the stench of racial prejudice" into the trial since the government was suggesting that Spann, who is black, was violent.

Rule 403 of the Federal Rules of Evidence provides, in pertinent part, that "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice ..." In *United States v. Ferguson*, 935 F.2d 1518, 1529 (7th Cir.1991), we noted that "[i]t is well established that a trial judge's assessment of relative probative value and unfair prejudice is generally accorded great deference because of his firsthand exposure to the evidence and his familiarity with the course of the trial proceeding." We have also noted that "[i]n reviewing decisions to admit evidence ... the district court's discretion, when exercised, will rarely be disturbed, ... and that we shall we reverse a decision of the trial court only for abuse of discretion." *United States v. Zapata*, 871 F.2d 616, 621 (7th Cir.1989) (citations omitted).

█ Given this deferential standard of review, we cannot say that the trial court abused its discretion in admitting evidence of Kuipers' note. The government argued that the note was evidence of the way in which Spann was using Kuipers as his agent in the ECRC scheme. Defendants-appellants' allegation that the note served

to paint Spann as a violent and dangerous man and was thus prejudicial to him may conceivably have some merit, but it was within the district court's discretion to weigh any possible prejudicial effect against the note's probative value and make its own evidentiary decision, and we refuse to disturb this well-reasoned decision based upon our review of the record. Although we, if acting in the capacity of the trial judge, may not have exercised our discretion in the same manner, we refuse to hold that the decision to admit the evidence was error much less an abuse of discretion. The defendants' reliance on *United States v. DeGeratto*, 876 F.2d 576 (7th Cir.1989) is misplaced. *DeGeratto* concerned a trial involving the receipt and transportation of stolen property during which the prosecution questioned the defendant about his alleged involvement with a prostitution ring. *Id.* at 580–81. In the instant case, no such "bad acts" unconnected to the indicted offense were improperly imputed to the defendant. The Kuipers note was probative of whether the defendants committed the crime for which they were indicted, the misapplication of federal funds and the conspiracy to defraud the federal government.

### B. Morris' statements to his accountants about the option extension.

█ Morris asserts that the trial court erred in admitting statements he made to an accountant concerning an ECRC-related business operation and the ECRC option that was exercised in 1985. As discussed above, the parties to the ECRC transaction, upon learning in 1984 that a lease transaction was no longer possible, converted the deal into one involving an option. This agreement was negotiated and signed in February, 1984. An amended option was eventually exercised on August 30, 1985. The tax returns filed at Morris' direction for the relevant period failed to report as income the monies paid to the ECRC-related company pursuant to the option.

Morris maintains that the admission of this evidence was improper because it successfully introduced "classic bad character

evidence" by suggesting to the jury that Morris was a liar. However, we have rejected the proposition that "statements of conspirators whose job is to prevent detection of the conspiracy are inadmissible." *United States v. LeFevour*, 798 F.2d 977, 982 (7th Cir.1986). Morris' failure to report the option money as income, and his statements to the accountants denying that the option had been exercised, could have reasonably been viewed by the trial judge as an effort to prevent detection of the conspiracy. Allowing receipt of this evidence did not rise to the level of an abuse of the trial court's broad discretion over evidentiary matters.

### C.  Buyout valuation evidence

▪ Morris' final claim of evidentiary error concerns the testimony of an accountant regarding his valuation of an interest in the ECRC partnerships. Morris claims this evidence was irrelevant and therefore inadmissible.

In 1975, the ECRC partners executed agreements providing for the sale of any deceased partner's interest to the surviving partners. In 1979, one of the partners died in a plane crash. An accountant determined that the deceased partner's ⅙th share in ECRC was worth $217,500 in 1980, placing the value of the entire partnership at $1,305,000. Testimony was received at trial concerning this valuation.

Morris claims that the valuation evidence based on the buy-back agreement was irrelevant as a matter of law since it related to a 1980 price and the ECRC transaction central to this case occurred in 1984. Under Fed.R.Evid. 401 " '[r]elevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." We have noted that " 'relevancy is a relationship between a proffered item of evidence and a fact that is of consequence to the determination of the action.' 1 *Weinstein's Evidence*, § 401[03], pp. 401–17. 'Whether or not a fact is of consequence is determined not by the Rules of Evidence but by

substantive law.' *Id.* at 401–19. Thus, before the district court could properly have received evidence ... the district court had to find that this fact was relevant to the determination of ... liability." *Sherrod v. Berry*, 856 F.2d 802, 804 (7th Cir.1988). Here, the valuation evidence about ECRC was offered to establish that the proposed transaction included payment of a fraudulently inflated price for the facility. Although the ECRC transaction which gave rise to this case was put together four years after the disputed valuation was made, it was evidence of the government's assertion that the ECRC transaction engineered by Morris and Spann hinged upon an inflated sale price for ECRC. We do not agree with Morris that the trial court abused its discretion in deciding that the buyout valuation was relevant to the proper price of ECRC in 1984.

### III.  THE FBI REPORTS

The defendants contend that the district court erred in ruling that the government was not required to produce certain FBI 302 reports pursuant to the Jencks Act, 18 U.S.C. § 3500 or *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). We will address each challenge separately.

### A.  Jencks Act

▪ The Jencks Act compels the government's production of statements a government witness has signed or otherwise adopted or approved and which relate to the subject matter as to which the witness has testified. 18 U.S.C. § 3500(a) & (b). The Act defines a statement as "(1) a written statement made by said witness and signed or otherwise adopted by him; (2) a ... substantially verbatim recital of an oral statement made by said witness and recorded contemporaneously with the making of such oral statement; or (3) a statement, however taken or recorded, or a transcription thereof, if any, made by said witness to a grand jury." 18 U.S.C. § 3500(e).

In considering a Jencks Act challenge, we must remember that " '[t]he district court is vested with broad discretion' in

determining whether a particular document is considered a producible document within the parameters of the Jencks Act, and '[i]ts findings in this respect may be disturbed on appeal only if they are clearly erroneous.'" *United States v. Herrero*, 893 F.2d 1512, 1522 (7th Cir.), *cert. denied,* — U.S. ——, 110 S.Ct. 2623, 110 L.Ed.2d 644 (1990) (quoting *United States v. Allen*, 798 F.2d 985, 994 (7th Cir.1986)).

The reports in question were of FBI interviews of Glenn Kuipers, a government witness. The reports were, appropriately, submitted by the government to the district court for an *in camera* inspection. "[I]f the defendant claims that the documents he seeks are statements as defined by the Jencks Act, but the government says they are not, then the *presumption* should be that the district court should hold an *in camera* hearing and after reviewing the documents make a determination of what should be turned over to the defendant.... [T]he district court must review the documents in question when their status as a Jencks statement is contested." *United States v. Allen*, 798 F.2d 985, 994 (7th Cir.1986). "The district court is vested with broad discretion in determining this question through an *in camera* inspection. Its findings in this respect may be disturbed on appeal only if they are clearly erroneous." *Id.* (quoting *United States v. O'Brien*, 444 F.2d 1082, 1087 (7th Cir. 1971)).

In determining whether material is producible under the Jencks Act, the "emphasis clearly is on whether the statement can fairly be deemed to reflect *fully and without distortion the witness's own words.*" *Id.* (citations omitted) (emphasis added). "A government agent's summary of a witness's oral statement that is not signed or adopted by the witness is not producible ...." because,

> [a] federal agent's written impression of what a witness said, his strategy, or his conclusions from what the witness said are obviously not statements of the witness—unless the government agent who is the interviewer is himself a witness

and testifies about the subject matter of that report.

*Id.*

The district court, in the instant case, stated, after its *in camera* inspection, that "[t]he government asserts these 302s were never adopted by the witnesses. And neither the documents themselves nor Defendants' arguments on the issue give the Court any reason to believe otherwise. I therefore find that the 302s in question are not statements covered by the Jencks Act and are not producible on its authority."[3] After government witness Kuipers testified, the defendants renewed their motion for production of the 302s. The motion was again denied by the trial court.

The defendants assert that the district court erred in several respects in its treatment of the Jencks Act question. They argue that the court impermissibly relied on the assertion of the government that the FBI reports were not statements as defined by the Act; that the court failed to review *all* the documents during its *in camera* inspections; that the court failed to consider whether Kuipers adopted the summaries or whether they were substantially verbatim; and that the court mistakenly refused the defendants' request for an evidentiary hearing to resolve these disputes.

The record is not definitive enough to determine whether the district court actually reviewed all ten FBI reports. The appellant's argument that the district court did not review all ten reports rests on a statement the trial judge made when he denied the second motion for production of the reports. In this exchange, the judge said "I determined that the two that I saw was not 3500 material." Appellants claim that the trial judge meant that he had reviewed only two of the 10 Kuipers reports. The government rejects this interpretation and argues that the judge meant that he had reviewed the 302 submissions pertaining to both Kuipers and Larry Crowel, another government witness.

The disputed FBI reports have been made part of the record on appeal,

---

3. The FBI reports are referred to as "302s".

and we have examined them to determine if they come within the parameters of documents which are producible under the Jencks Act. Our review of the FBI reports convinces us that they are not statements producible under the Jencks Act. The documents are reports prepared by FBI agents *summarizing* oral interviews with Glenn Kuipers. As we pointed out above, "[a] government agent's summary of a witness's oral statement that is not signed or adopted by the witness is not producible." *Allen,* 798 F.2d at 994. Our review of the disputed reports confirms the district court's well-reasoned judgment that the documents are not statements producible under the Jencks Act because they were neither signed nor adopted by Kuipers and further because they are not a verbatim recital of an oral statement but rather only an agent's summary of the witness' statement. We reject the appellants' argument and refuse to expand the law and order a remand of this matter for an evidentiary hearing to determine whether the reports are producible. We will not depart from precedents which hold that the determination of whether materials are producible under the Jencks Act "need not be a full evidentiary hearing, but merely an *in camera* review of the disputed document.... In most cases, the answer will be plain from the statement itself." *Allen,* 798 F.2d at 994 (citation omitted).[4]

### B. *Brady*

The defendants also argue that these FBI reports should have been made available to them pursuant to *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). In *Brady,* "the Supreme Court held 'that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution.'" *United States v. Navarro,* 737 F.2d 625, 631 (7th Cir.), *cert. denied, Mugercia v. United States,* 469 U.S. 1020, 105 S.Ct. 438, 83 L.Ed.2d 364 (1984) (quoting *Brady,* 373 U.S. at 87, 83 S.Ct. at 1196). The appellants mention this argument in their briefs without detailing the specific reasons why they believe they were entitled to the FBI reports under *Brady* and, in fact, make little more than a bold assertion that the trial court erred when it failed to order production of the reports pursuant to their motion for favorable evidence. This buckshot approach was properly rejected by the district court. In denying the motion, the trial judge stated that the "[d]efendants have offered nothing but pure conjecture or speculation that any of these documents contain exculpatory Brady material. The Government ... asserts it has turned over all exculpatory material. And under these circumstances, the Court is not required to order disclosure or even to take on the burden of sorting through an in camera proffer to determine if exculpatory material exists."

We review the trial court's decision to deny the *Brady* request under an abuse of discretion standard. *United States v. Romo,* 914 F.2d 889, 898 (7th Cir.1990), *cert. denied, Romo v. United States,* — U.S. —, 111 S.Ct. 1078, 112 L.Ed.2d 1183 (1991). The defendants' *Brady* request, as the trial court found, was speculative and merely requested "favorable evidence" that might be in the government's witness statements. "We have held that a defendant is not entitled to discovery material under *Brady* 'without even a hint that impeaching material was contained therein' ... or where the defendant 'has

---

**4.** In his brief, Morris mentions that Kuipers, during cross-examination, answered "I would say four or five times" when asked how many times he had met with prosecutors and FBI agents. Morris then contrasts this with the government's submission to the district court that there were ten FBI reports pertaining to Kuipers. Although he does not develop this point, Morris appears to be implying that this discrepancy has some bearing on the producibility of these reports pursuant to the Jencks Act or *Brady.* We disagree. Our review of the FBI reports discloses that Kuipers met with FBI agents and prosecutors on eight occasions over a 17 month period. The witness' recollection and statement during cross-examination that "four or five" such meetings occurred is not grounds for concluding that the reports contain impeachment or exculpatory evidence.

made no showing at all by affidavits or otherwise that any evidence was suppressed by the government.' " *Romo*, 914 F.2d at 898–899 (citations omitted). "Mere speculation that a government file may contain Brady material is not sufficient to require a remand for *in camera* inspection, much less reversal for a new trial. A due process standard which is satisfied by mere speculation would convert *Brady* into a discovery device and impose an undue burden upon the district court." *Navarro*, 737 F.2d at 631. Thus, we refuse to conclude that the district court abused its discretion in denying production of the FBI reports pursuant to the appellants' *Brady* request.

### IV. WHARTON'S RULE

■ Defendant-appellant Spann argues that it was a violation of Wharton's rule for him to be convicted of conspiring to defraud the United States under 18 U.S.C. § 371 through mail fraud and the misapplication of federal monies *and* convicted of the substantive offenses of mail fraud and the misapplication of federal monies under 18 U.S.C. §§ 1341 and 666(a). Wharton's rule is an exception to the general rule that a conspiracy and the completed substantive offense are separate crimes and may be punished by separate sentences. Defendants convicted of crimes to which Wharton's rule applies may not be punished for both the conspiracy and the completed substantive offense. *Iannelli v. United States*, 420 U.S. 770, 777–80, 95 S.Ct. 1284, 1289–91, 43 L.Ed.2d 616 (1975). However, "Wharton's rule applies only to offenses that *require* concerted criminal activity, a plurality of criminal agents." *Id.* at 786, 95 S.Ct. at 1293.

■ The substantive offenses of mail fraud and misapplication of federal revenue sharing funds do not have as an element concerted criminal activity. Both statutes, 18 U.S.C. §§ 666(a) and 1341, define offenses that may be committed by a single person. Wharton's rule is inapplicable and Spann's argument is without merit.

### V.

Both Morris and Spann contend that the district court abused its discretion in sentencing. Since the crimes for which the defendants were convicted were committed before November 1, 1987, the United States Sentencing Guidelines do not apply. *United States v. Johnson*, 903 F.2d 1084, 1092 (7th Cir.1990). [I]t is "irrelevant that had this been a Guidelines case, the defendants might have received lighter sentences." *Id.*

"Mounting a challenge to a statutorily authorized sentence is an uphill struggle ... Sentences within the maximum term provided by Congress are reviewable in this circuit only for a manifest abuse of discretion ... A district court abuses its discretion if it relies upon inaccurate information in exercising its discretion, or fails to exercise any discretion at all." *United States v. Threw*, 861 F.2d 1046, 1049 (7th Cir.1988) (citations omitted).

■ The sentences in this case are proper and fair and certainly do not rise to the level of an abuse of discretion. Morris was sentenced to five years imprisonment for conspiracy to defraud the United States, ten years imprisonment for misapplication of federal funds and five years for one count of mail fraud, for an aggregate sentence of twenty years, to be followed by a period of probation for the second mail fraud conviction. Morris faced a possible aggregate sentence of 25 years. Spann, convicted of the same four crimes, received a total sentence of ten years consecutive to a twenty year sentence previously imposed for other corrupt conduct. Like Morris, he could have received a maximum sentence of 25 years for his crimes.

■ Although Morris received a heavier sentence than Spann or Kuipers (who received a two-year sentence for his involvement in the ECRC scheme), that, alone is an insufficient reason for reversal of his sentence. "[A] mere showing of disparity in sentences among codefendants.... does not, without more, demonstrate an abuse of the district court's discretion." *Threw*, 861 F.2d at 1049.

Finally, we observe that because these are pre-Guidelines sentences, the appellants may move in the district court for reductions of their sentences pursuant "to the version of Rule 35(b) of the Federal Rules of Criminal Procedure in effect for this case." *United States v. Goot,* 894 F.2d 231, 238 (7th Cir.1990).

## CONCLUSION

The defendants-appellants' convictions and sentences are AFFIRMED.